Betty SOWERS, Plaintiff,

v.

KEMIRA, INC., Defendant.

No. CV487–170.

United States District Court,
S.D. Georgia,
Savannah Division.

Feb. 17, 1988.

G. Paris Sykes, Jr., Atlanta, Ga., R. Jonathan Hart, Savannah, Ga., for defendant.

ORDER

EDENFIELD, District Judge.

This Title VII action was tried before the Court on February 1, 2 and 3, 1988. Plaintiff Betty Sowers alleges that her employer, defendant Kemira, Inc., subjected her to (1) *quid pro quo* sexual harassment, (2) retaliation for her assertion of Title VII rights, and (3) wage discrimination based on sex. Having heard the testimony of the witnesses and the arguments of counsel, and having reviewed the exhibits, the Court makes the following findings of fact and conclusions of law. To the extent that any findings of fact constitute conclusions of law, they are adopted as such. To the extent that any conclusions of law constitute findings of fact, they are so adopted.

FINDINGS OF FACT

1. The plaintiff, Betty Sowers, is a 37 year old female. Ms. Sowers has no college degree, but she has some five years of work experience in industrial engineering. She has the equivalent of a two-year degree in industrial engineering pursuant to in-house training received from a former employer.

2. Early in 1985 (late January or early February), Ms. Sowers was referred to E.V. (Jack) Skinner, Manager of the Human Resources Department at Kemira, Inc., by an employment agency. At that time, there was a position open for an inventory control clerk in the company store.

3. Mr. Skinner invited the plaintiff to interview for the position of inventory control clerk. An interview was conducted in Mr. Skinner's office, during which Mr. Skinner was made aware of plaintiff's background in industrial engineering, and her desire to find a job in that field.

4. Plaintiff also interviewed with the supervisor over the inventory control clerk position, Fred Hunley, who was impressed with plaintiff's qualifications for the position. Additionally, at some point in the

Charles Ashman, Jeff Lasky, Elizabeth F. Bunce, Savannah, Ga., for plaintiff.

hiring process, Mr. Skinner introduced plaintiff to Ray Brinson, who would be her second level supervisor in the inventory control clerk position. Plaintiff found it strange that Mr. Brinson did not inquire into her qualifications.

5. Mr. Skinner informed plaintiff that she was being offered the inventory control clerk position. With respect to plaintiff's desire to obtain an industrial engineering position, Mr. Skinner indicated that by accepting the inventory control clerk position, she would then have her foot in the door and would be in a position to advance to the engineering department if a vacancy arose.

6. Plaintiff began working at Kemira, as an inventory control clerk in the company store, on February 11, 1985. Her starting salary was $1,050.00 per month.

7. The plaintiff's immediate supervisor, Fred Hunley, testified that plaintiff's work performance as an inventory control clerk was satisfactory. He had no complaints or problems with plaintiff, and acknowledged that she arrived early for work "quite often."

8. On March 1, 1985, Charlyn Green resigned from the position of plant buyer at Kemira. Mr. Skinner invited plaintiff to apply for the position.

9. In early March, 1985, Mr. Skinner conducted an interview with plaintiff, ostensibly for the purpose of evaluating her qualifications for the position of plant buyer. During the interview, Mr. Skinner made inquiries into plaintiff's personal situation, including whether she drank alcoholic beverages, and whether she was sexually satisfied with her husband.

10. Plaintiff was never seriously considered for the position of plant buyer. On April 1, 1985, the plant buyer's position was filled by Frank Hester, who had worked at Kemira between 1977 and 1983. Mr. Hester had obtained his M.B.A. from Wake Forest University during his time away from Kemira. Mr. Hester was clearly more qualified than plaintiff for the position of plant buyer.

11. During her tenure as an inventory control clerk, plaintiff was intent on obtaining a position as an industrial engineer, consistent with her background, qualifications, and interest. Plaintiff approached Mr. Gene Johnson, who was the only industrial engineer at Kemira, and informed him of her qualifications and interest. Mr. Johnson indicated that he could, in fact, use some assistance in meeting his responsibilities as industrial engineer. The demands on the industrial engineering position at Kemira were exceptionally heavy at that time because Kemira (formerly American Cyanamid) was still in a transitional period as a result of a corporate takeover.

12. Between February 11, 1985, and May 21, 1985, plaintiff met several times with Dr. George Roberts, Vice President of Operations at Kemira's Savannah plant, and discussed with him the possibility of a promotion to the Industrial Engineering Department.

13. Dr. Roberts authorized plaintiff's promotion to the position of industrial engineering aide, effective May 21, 1985. The promotion was on a six-month trial basis, with the understanding that if plaintiff performed acceptably, the position was to be made permanent. Gene Johnson, the plant's only industrial engineer, became plaintiff's supervisor. Plaintiff's salary was increased from $1,050.00 per month to $1,207.00 per month.

14. In her position as an industrial engineer aide, plaintiff was classified as a Level–G non-exempt salaried employee. In 1985, the recommended salary range for Level G employees began with a minimum salary of $1,392.00. Plaintiff was paid below the minimum recommendation at $1,207.00 per month; however, it was understood that if plaintiff performed well and her position became permanent, her salary would be increased at the end of her six-month trial period.

15. Plaintiff was replaced as inventory control clerk by a temporary employee. It was understood that if plaintiff's trial as an industrial engineer aide did not work out, she could return to the position of inventory control clerk.

16. Plaintiff learned quickly, and applied skills acquired in prior employment, in

performing her job as industrial engineering aide. Plaintiff's supervisor, Gene Johnson, was generally pleased with her job performance.

17. In a memo dated September 11, 1985, Mr. Johnson indicated to his supervisor, R.W. Leach, that he was satisfied with plaintiff's job performance. In the memo, Mr. Johnson strongly recommended that the Engineering Aide position be made permanent. Mr. Johnson testified that he was only recommending in his memo that *the position* be made permanent, "not necessarily" to be filled by Betty Sowers. The Court reads Mr. Johnson's memo as a recommendation that *plaintiff's* employment as engineering aide be made permanent. On examination, Mr. Johnson somewhat reluctantly acknowledged that his intention at the time his September 11 memo was drafted was to make plaintiff a permanent engineering aide.

18. At some point late in 1985, or early in 1986, Dr. Roberts informed Jack Skinner that Betty Sowers' engineering aide position was to be made permanent, and directed him to prepare a salary recommendation. Mr. Skinner never prepared the salary recommendation as directed.

19. Kemira has in force a Progress Review Policy which requires that supervisors formally review the performance of employees under their supervision at least once per year. As part of the formal review process, an employee's immediate supervisor must complete a written progress review form, which form is to be discussed with the employee. The progress review form calls for evaluation of an employee's job performance in the areas of results, job knowledge and skills, dependability, initiative, and relationships.

20. On September 25, 1985, Gene Johnson completed a progress review form which evaluated plaintiff's job performance in the position of industrial engineering aide for the period from May 21, 1985 through September 25, 1985. Plaintiff's performance was rated as "consistently acceptable" in all categories except for initiative, in which category plaintiff's performance was rated as "superior." One of the

categories, dependability, encompassed consideration of plaintiff's attendance and tardiness record.

21. During the period from May 21, 1985, through September 25, 1985, plaintiff missed approximately six full days of work, and portions of approximately three other days. These absences were generally due either to illness or to plaintiff's need to attend to her children. Mr. Johnson was concerned about the amount of plaintiff's absenteeism, but not to the extent that he felt it necessary to refer to absenteeism in the progress review form. Notwithstanding plaintiff's absences, Mr. Johnson rated plaintiff consistently acceptable in dependability, and her overall progress review was a good one.

22. Between September 25 and December 19, 1985, plaintiff's absenteeism frequency continued largely as before. During this period, plaintiff missed approximately one full day for sickness, and portions of approximately four other days, either for sickness or in order to attend to her children. On December 19, 1985, Mr. Johnson discussed with plaintiff the progress review he had previously completed on September 25, 1985. Mr. Johnson made clear his general satisfaction with plaintiff's performance, and orally expressed his desire that plaintiff reduce her level of absenteeism, and limit her use of the phone for personal calls. Mr. Johnson did not consider plaintiff's absenteeism and phone use sufficiently troublesome to refer to it on the written evaluation.

23. After plaintiff's six month trial period was completed (November 21, 1985), she began to make inquiries as to whether and when her job would be made permanent and her salary increased. Mr. Johnson indicated that, after his recommendation, Mr. Skinner and Dr. Roberts were the individuals who would be involved in finalizing the personnel action.

24. During December and January, 1985, plaintiff met a number of times with Jack Skinner to discuss the possibility of making her engineering aide position permanent and raising her salary. Mr. Skinner, during these meetings, would direct

the conversation toward personal matters. Mr. Skinner told plaintiff that she was pretty and had sexy eyes. He invited her to lunch or out for drinks after work. On one occasion, Mr. Skinner invited plaintiff to a "skinny-dipping" party in Bluffton, South Carolina. On another occasion, Mr. Skinner asked plaintiff to make out with him. With respect to plaintiff's job, Mr. Skinner generally intimated that final authorization for making her job permanent and raising her salary had not yet been received.

25. On New Year's Eve, 1985, Mr. Skinner approached plaintiff's workspace, where she was engaged in conversation with a male co-worker. Mr. Skinner entered the conversation, and told some dirty jokes. After the other employee left, Mr. Skinner invited plaintiff to go to the company store and have sex. Plaintiff became flustered and did not give a definitive response. Mr. Skinner left to get the keys to the storeroom and plaintiff left the plant site before he returned.

26. During the first week of February, 1986, plaintiff met with Mr. Skinner again, to inquire about her job being made permanent. Dr. Roberts' direction that Mr. Skinner prepare a salary recommendation for plaintiff's permanent job had by this time been before Mr. Skinner for several weeks or longer. Mr. Skinner expressed to plaintiff his disappointment that she had not acceded to his request to have sex in the company store. Mr. Skinner indicated to plaintiff that if she "played his game" she would get what she wanted.

27. Plaintiff left Mr. Skinner's office in a distraught condition. She discussed what had transpired in Mr. Skinner's office with Sheila Walcott (at the time, Ms. Walcott was a storeroom clerk at Kemira; she is presently employed as a security officer at the U.S. Treasury Department). Plaintiff was visibly upset and told Ms. Walcott that Mr. Skinner was linking her promotion to an effort to persuade her to have sex with him. Testimony concerning plaintiff's statements to Ms. Walcott was admitted pursuant to Fed.R.Evid. 801(d)(1)(B), 803(1), or 803(2), alternatively. Ms. Walcott advised plaintiff to discuss the situation with her supervisor, Mr. Johnson.

28. Plaintiff did report Mr. Skinner's conduct to Mr. Johnson. Mr. Johnson took plaintiff's allegations very seriously, and indicated that he would report plaintiff's allegations to the proper management officials.

29. Management officials of defendant, Kemira, Inc., have testified that Mr. Skinner had no authority to prevent plaintiff's position from being made permanent, or to prevent her from getting a raise. Such decisions, Kemira officials testified, were ultimately to be made by Mr. Johnson and Dr. Roberts. Notwithstanding defendant's efforts to minimize the amount of influence Mr. Skinner had on personnel decisions, it is clear that Mr. Skinner's recommendations carried substantial weight. Further, even if Mr. Skinner's role could be characterized as mere paperwork, as defendant has suggested, it is clear that no final decision would be made by Dr. Roberts until promotion and salary range recommendations were forwarded to him by Mr. Skinner. Mr. Skinner had the power to, and did, delay effectuation of the decision to make plaintiff's position permanent and raise her salary, which decision Mr. Johnson and Dr. Roberts had attempted to set into motion. Mr. Skinner accomplished this delay simply by not acting on Dr. Roberts' request that he prepare salary recommendations for conversion of plaintiff's position to permanent.

30. Mr. Skinner hoped that, by holding up plaintiff's promotion, he could persuade her to accede to his sexual advances in exchange for his recommendation on her promotion.

31. Two former employees of Kemira, Janice Lollis Henderson and Carol Wesse, testified that Mr. Skinner made numerous inappropriate sexual advances to them while they were employed at Kemira, both at and away from the plant. This testimony was admitted under Fed.R.Evid. 404(b) on the issue of Mr. Skinner's motive, intent, or plan in delaying plaintiff's promotion and making sexual advances to her. The Court found both Ms. Henderson and

Ms. Wesse to be credible witnesses. Mr. Skinner's blanket denial of their allegations was not credible.

32. After plaintiff reported Mr. Skinner's conduct to Mr. Johnson, Mr. Johnson notified his supervisor, R.W. Leech. A meeting was arranged between plaintiff, Mr. Johnson, Dr. Roberts and Mr. Leech, for the purpose of discussing plaintiff's allegations against Mr. Skinner. The meeting was held on February 7th. At the meeting, plaintiff set forth in detail the facts and circumstances of the sexual advances made by Skinner. Dr. Roberts responded by asking plaintiff if she knew Skinner's wife, and informing plaintiff that Skinner's wife would kill him if she found out about the allegations. Dr. Roberts stated his belief that plaintiff could handle the situation herself.

33. Dr. Roberts reported plaintiff's allegations to the president of the plant, Tom Worsham. Mr. Worsham gave Dr. Roberts the responsibility for investigating the allegations. Mr. Worsham did not give Dr. Roberts any guidance, or place any limitations, on the scope of the investigation to be conducted.

34. Dr. Roberts' entire investigation consisted of confronting Skinner with the plaintiff's allegations and asking the Plant Safety Director, Joseph Clonts, if he had heard any rumors to substantiate plaintiff's charges. Both Skinner and Clonts responded to Dr. Roberts' inquiries in the negative, and Dr. Roberts concluded his investigation, finding no evidence to substantiate plaintiff's charges.

35. Dr. Roberts testified that the reason his investigation was so limited was that he was concerned about damaging Skinner's reputation, and did not want to spread rumors. Therefore, Dr. Roberts did not interview any other employees at Kemira. Dr. Roberts testified that he adhered to the position that someone accused of misconduct is innocent until proven guilty. Dr. Roberts' concern for Mr. Skinner's reputation inhibited his investigation. As a result, the investigation was superficial.

36. A few days after the February 7 meeting, having concluded his investigation, Dr. Roberts prepared a confidential memorandum of the February 7th meeting and of the results of his investigation. The memo was written to plaintiff, and informed her that her "recent attendance record" was unacceptable, and that she was making an excessive number of personal phone calls on the job. The memo also informed plaintiff that Dr. Roberts had investigated her allegations in detail and found no evidence to substantiate them.

37. Although Dr. Roberts' memo was written to plaintiff, she did not receive a copy of it until April 4th, 1986. Dr. Roberts, instead of giving the memo directly to plaintiff, gave two copies to Mr. Skinner. Skinner did not understand that he was to give plaintiff a copy.

38. Dr. Roberts' memo purports to summarize the meeting of February 7. However, the memo focuses on plaintiff's attendance record and phone use, when the purpose and focus of the meeting was to discuss plaintiff's allegations of sexual harassment. The reference to "recent attendance" problems is highly suspect, because plaintiff had only missed one day (sick leave) plus one hour the following morning (overslept) since discussing her progress review with Mr. Johnson on December 19, 1985. Dr. Roberts' effort to document shortcomings in plaintiff's work performance only days after she made an allegation of sexual harassment, and at a point when her attendance record had in fact been improving, leads the Court to conclude that Dr. Roberts' memo was the beginning of a course of retaliation undertaken by Kemira in response to plaintiff's allegations.

39. Dr. Roberts adhered to his "innocent until proven guilty" attitude towards allegations against Mr. Skinner; but, suspecting that the allegations might be true, and fearing a lawsuit, Dr. Roberts felt it necessary to document an alternative basis for the delay in plaintiff's promotion. Dr. Roberts hoped that, by taking the offensive and spelling out plaintiff's shortcomings, the "problem" would go away.

40. Consistent with this strategy, on February 11, only days after plaintiff reported her allegations, Mr. Johnson issued a written reprimand to plaintiff indicating that plaintiff's progress was "definitely being jeopardized by absenteeism, and the use of the telephone for personal calls." Copies of this memo were distributed to Mr. Leech, Dr. Roberts, and Mr. Skinner. The memo was issued pursuant to a strategy by Kemira management to document a non-discriminatory basis for the delay in plaintiff's promotion, and dispel the impression that Mr. Skinner had been holding up plaintiff's promotion. These actions were taken in an effort to create a record that would stand up to feared litigation; and, in effect Kemira retaliated against plaintiff by attaching, for the first time, job-threatening significance to what had formerly been considered minor attendance and phone use problems.

41. Plaintiff's work performance was, in fact, marred to some extent by absenteeism and phone use; however, these problems became the basis of adverse action only in response to plaintiff's allegations of sexual harassment. Overall, plaintiff's work performance had been acceptable, as documented in plaintiff's progress review prepared by Mr. Johnson on September 25, 1985, and discussed with plaintiff on December 19, 1985.

42. On April 2, 1986, Mr. Johnson issued plaintiff a "final warning" memo. The "final warning" memo is rather curious. The memo starts by informing plaintiff that her previously referenced attendance and phone use problems were under control. The memo then goes on the advise plaintiff of a recent complaint from the maintenance department that she was spending too much time talking to the mechanics. This is the only specific complaint in the memo, and it is one that had never been discussed with plaintiff before, yet Mr. Johnson closed the memo by stating that "unless there is an immediate and continued improvement in all aspects of your work, severe disciplinary action will be taken."

43. Plaintiff's attendance record had actually gotten worse between the time of Mr. Johnson's written reprimand of February 11, and the "final warning" of April 2. Thus, it is unclear why Mr. Johnson suddenly believed that plaintiff's attendance and phone use problems were under control. The timing of the various documents referring to plaintiff's attendance problems makes no sense when viewed in relation to her actual attendance record. For this reason, among others, the Court finds that plaintiff's attendance record was used by Kemira as a handy reference to be invoked when some pretext for adverse action was needed.

44. The April 2 final warning memo was not warranted by the complaint from the maintenance department that plaintiff was spending too much time talking to mechanics. The complaint was made after plaintiff completed a work-sampling of the maintenance department. A "work sampling" is a sort of efficiency study. When doing a work sampling, an industrial engineer is required both to observe employees at work and to ask questions about the observed employees' duties. The results of plaintiff's work sampling of the maintenance department were unfavorable. Mr. Johnson understood that the maintenance department's complaints about plaintiff might be attributable to dissatisfaction with the results of her work sampling. If plaintiff had not asserted her Title VII rights, the complaint would have constituted no cause for alarm, and would have resulted in no more than an oral counseling session. The final warning memo violated Kemira's own progressive discipline policy, which requires supervisors first to counsel employees verbally, in a non-punitive approach, about any perceived problem. Only if problems persist is a written reprimand to be issued. Instead, as part of Kemira's continuing course of retaliation, Mr. Johnson, prematurely and without justification, issued the final warning memo.

45. Mr. Johnson discussed the final warning memo with plaintiff on April 4, 1986. At the same time, Mr. Johnson presented to plaintiff, for the first time, Dr. Roberts' confidential memo describing

the meeting of February 7, in which Dr. Roberts indicated that he had completed his investigation and had discovered no evidence to support plaintiff's allegations. After being given these documents, plaintiff began crying, and said she thought it was part of her job to ask questions of employees she was observing. Plaintiff was upset, and asked for the day off.

46. Before leaving, plaintiff spoke with Sheila Walcott. Plaintiff showed Walcott Mr. Johnson's letter and said that she had followed Walcott's advice to report her allegations to Mr. Johnson, but that now Mr. Johnson had turned on her. Plaintiff was hysterical, and Ms. Walcott persuaded her to go and see a doctor. Testimony concerning plaintiff's statements to Walcott was admitted pursuant to Fed.R.Evid. 801(d)(1)(B), 803(1), and 803(2), alternatively.

47. Plaintiff suffered a stress-related breakdown, and remained on disability from April 4, 1986, through October 1, 1986.

48. Due to past experiences, including having been molested by her stepfather as a child, plaintiff is more vulnerable to emotional stress than a typical person.

49. Notwithstanding her troubled past, plaintiff was coping with her problems, and functioning productively, up until the time she was sexually harassed at Kemira, and Kemira management responded to her allegations with retaliation. If not for the sexual harassment and retaliation at Kemira, plaintiff would not have become disabled. On the other hand, if not for plaintiff's unusual vulnerability to stress, Kemira's actions would not have caused her to become disabled.

50. If plaintiff's promotion had not been held up by Mr. Skinner, she would have been made permanent industrial engineering aide shortly after the expiration of her six month trial period. If not for Skinner's sexual harassment of plaintiff, and Kemira management's subsequent retaliation in response to her allegations, plaintiff would have been promoted to the position of permanent industrial engineering aide, and

would have remained in that position without any period of disability.

51. On May 20, 1986, plaintiff filed a formal charge of discrimination with the Equal Employment Opportunity Commission.

52. On July 7, 1986, Kemira hired a recent engineering graduate from Georgia Southern College, Scott Barfield, as a temporary industrial engineering aide. The new engineering aide was a male, and was paid $11.95 per hour, whereas plaintiff had been paid approximately $6.97 per hour. Unlike plaintiff, the new engineering aide had a four-year college degree. However, he had no significant engineering experience and did not perform more advanced or difficult work than plaintiff. The male engineering aide resigned on September 5, 1986. His employee status was temporary, so his wages were not accompanied by benefits as plaintiff's were.

53. The disparity between plaintiff's wage ($6.97 per hour) and Scott Barfield's wage ($11.95 per hour) was due to factors other than sex. First, and most significantly, plaintiff's salary was set at an intermediate level for purposes of her six-month trial period, during which her competence in the position could be evaluated. It was understood that if plaintiff performed acceptably, she would receive another raise. Second, Scott Barfield had a bachelor's degree in engineering from Georgia Southern. Plaintiff did not. For this reason, it was reasonable to require plaintiff to undergo a trial period and prove her skills. Finally, Barfield was a temporary employee whose wages were not accompanied by benefits, as plaintiff's were. Plaintiff's sex had no impact on her initial salary as an industrial engineering aide.

54. On September 5, 1986, plaintiff received an offer of employment from Boeing, Georgia, Inc., in Macon, Georgia. Plaintiff declined the offer of employment because she did not want to move from Savannah to Macon.

55. Plaintiff attempted to return to work on October 1, 1986. Due to various bureaucratic requirements at Kemira, plaintiff was not permitted to return to

work until November 10, 1986. In the interim, plaintiff received no wages or disability benefits. The circumstances of plaintiff's attempt to return to work demonstrate a degree of bureaucratic ineptitude on the part of Kemira, but are not relevant to the issues in this lawsuit. The *delay* was not retaliatory.

56. Plaintiff was permitted to return to work on November 10, 1986. The conditions of plaintiff's return to work were outlined in a letter from Kemira's safety director, Joe Clonts, dated November 6, 1986. In the letter, plaintiff was informed that she was being transferred to the Accounting Department. Mr. Clonts indicated that the purpose of the transfer was to place plaintiff under a female supervisor. According to Clonts' letter, this was necessary, in light of plaintiff's charges of sexual discrimination, to remedy the situation and avoid any further potential conflict.

57. Plaintiff has no background in accounting.

58. Upon her return to work, plaintiff was placed at a small free-standing table and straight chair, and assigned the menial task of filing invoices. Plaintiff's work station was substantially less pleasant than before, and substantially less pleasant than that of other employees in similar positions. Although plaintiff's salary was not reduced, in terms of work conditions, job duties, and career advancement potential, her transfer was a clear demotion.

59. Plaintiff requested to be transferred back to the engineering department, but her request was denied.

60. Plaintiff's assignment to the accounting department was another manifestation of Kemira's continuing course of retaliation.

61. Kemira's explanation that it was necessary to place plaintiff under a female supervisor is implausible. Plaintiff had not had any problem working under male supervisors (Mr. Hunley and Mr. Johnson). Rather, plaintiff was sexually harassed by Mr. Skinner, the manager of the Department of Human Resources, whose position in relation to plaintiff was unchanged by her transfer to the Accounting Department.

62. Granted, Kemira was placed in a delicate position when plaintiff returned to work. In her EEOC complaint, plaintiff had named her former supervisor, Mr. Johnson, as one of several Kemira officials who had "done nothing" in response to her allegation of sexual harassment. In these circumstances, a reluctance to place plaintiff in her former position is understandable. Nevertheless, the substantial demotion in all respects except salary was a product of callousness and, in some degree, vindictiveness on the part of Kemira management. A clear signal was sent to Kemira employees that any employee who dared to assert Title VII rights would pay a heavy price.

63. Plaintiff continued to work in the accounting department until January 14, 1987, at which time Dr. Mobley, plaintiff's psychiatrist, determined that plaintiff's work conditions were exacerbating her psychological problems, and placed her back on disability.

64. Plaintiff has remained on disability to this day. Plaintiff would not have become disabled if not for the sexual harassment and retaliation she was subjected to at Kemira. Again, however, if plaintiff were not unusually vulnerable to stress, she would not have been rendered disabled by Kemira's actions.

65. It is company policy at Kemira not to tolerate sexual harassment or discrimination. Unfortunately, the policy is not self-executing. Here, Kemira management was confronted with a charge of sexual harassment. Without adequate investigation, a not surprising credibility choice was made; Kemira stood behind a management official, an employee of 22 years in a responsible position. It became necessary, in the yes of management, to document a non-discriminatory reason for the delay in plaintiff's promotion. Written reprimands followed. The retaliation was more reflexive and defensive than malicious. That, however, is no excuse. After Kemira management assumed a posture of denial

and confrontation, a course of retaliation followed inexorably.

66. Had plaintiff's promotion not been denied as a result of *quid pro quo* sexual harassment and retaliation, plaintiff's salary would have been raised to $1,830.00 per month. This figure is necessarily based, to some degree, on speculation. The Court arrives at this figure because, in 1986, it was the midpoint, or guideline, salary for the range assigned to plaintiff's position of industrial engineering aide (Grade G). I find that, upon her promotion, plaintiff would have received a raise to some level between the minimum Grade G salary ($1,440.00) and the mid-point, or guideline, Grade G salary ($1,830.00). It is appropriate to resolve the uncertainty against the defendant and fix plaintiff's salary at $1,830.00 per month. Plaintiff has argued that her salary should be set at $11.95 per hour ($24,856.00 per year/$2,068.00 per month), in order to match the wage of Scott Barfield, the industrial engineering aide who replaced plaintiff on a temporary basis while she was disabled. The $11.95 per hour figure is too high because (1) Barfield had a four year engineering degree, which plaintiff lacked, (2) the replacement's wage was not accompanied by any benefits; thus, it is not as disparate as it appears, and (3) plaintiff's job performance was acceptable, but not without flaws, and a salary at the high end of Grade G would not have been authorized.

67. Plaintiff's promotion would have been made effective sometime after the six month trial period expired (November 21, 1985), and after Dr. Roberts directed Mr. Skinner to prepare a salary recommendation, and after some delay for completion of the various bureaucratic steps. The promotion would have been finalized sometime between January 1, 1986 and February 15, 1986. These dates are necessarily based, to some degree, on speculation. Resolving the uncertainty against the defendant, I find that plaintiff's promotion would have been made effective on January 1, 1986, if not for delay caused by Mr. Skinner as a result of *quid pro quo* sexual harassment.

68. Plaintiff has incurred attorney fees in the total amount of $106,010.00, plus paralegal fees in the total amount of $5,332.50. The attorneys for both plaintiff and defendant did an excellent job of preparing and trying this case. However, I find that the use of three attorneys on plaintiff's side was unnecessary. My impression is that two of plaintiff's attorneys, Ms. Bunce and Mr. Lasky, did most of the work. Ms. Bunce, it appears, has experience in the field of employment discrimination, and contributed substantial research and writing time. She also participated in trying the case. Mr. Lasky served as lead trial counsel. Both Ms. Bunce and Mr. Lasky were involved in the discovery process. Mr. Ashman, the most experienced trial lawyer of the three, served something of a supervisory role, monitoring the status of the case and discussing it with the other attorneys along the way. All three attorneys attended some of the depositions. While Mr. Ashman's time may have been justified given the relative inexperience of Ms. Bunce and Mr. Lasky, the expense cannot justly be imposed on an opposing party. Accordingly, the hours submitted are approved except that Mr. Ashman's hours are reduced to ten.

69. A reasonable hourly rate is $100.00 per hour for Ms. Bunce and Mr. Lasky, and $125.00 for Mr. Ashman.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over plaintiff's Title VII claims under 42 U.S.C. § 2000e–5(f)(3).

2. Plaintiff has satisfied all statutory prerequisites for bringing this action.

3. Defendant is an "employer" within the meaning of 42 U.S.C. § 2000e(b).

4. The issues before the Court are: (1) whether plaintiff was subjected to wage discrimination based on sex; (2) whether plaintiff was subjected to *quid pro quo* sexual harassment, i.e., whether plaintiff's promotion was withheld because she rejected Mr. Skinner's sexual advances; and (3) whether Kemira retaliated against plaintiff because she complained of employment practices made unlawful by Title VII.

### Wage Discrimination

■ 5. Sex-based wage discrimination violates Title VII. 42 U.S.C. § 2000e–2(a); *County of Washington v. Gunther*, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981).

■ 6. Proof that an employer pays different wages to employees of opposite sex "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions," establishes a *prima facie* case of sex-based wage discrimination under Title VII. *See Morgado v. Birmingham–Jefferson County Civil Defense Corps*, 706 F.2d 1184, 1187–88 (11th Cir.1983). Plaintiff has made a *prima facie* case under this standard.

7. The Eleventh Circuit has yet to decide how the shifting burdens should be allocated in sex-based wage discrimination cases under Title VII. There is some question whether the burdens of proof and production are the same as those enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), or whether the burden of proof should be allocated in the same fashion as in actions under the Equal Pay Act. *See Feazell v. Tropicana Products, Inc.*, 819 F.2d 1036, 1040 (11th Cir. 1987).

8. Under the *McDonnell Douglas/Burdine* standard, once a plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for wage disparities. While a burden of production is imposed on the defendant, the burden of persuasion always remains with the plaintiff. Thus, if the defendant articulates a legitimate non-discriminatory reason for the disparate wage, the plaintiff must prove by a preponderance of evidence that the legitimate reasons offered by defendant were not true reasons, but were a pretext for discrimination. *See Feazell v. Tropicana Products, Inc.*, 819 F.2d 1036, 1039 (11th Cir.1987).

■ 9. Under the Equal Pay Act, the burden that shifts to the defendant once a plaintiff has established a *prima facie* case of wage-discrimination is one of both production and persuasion. *See Corning Glass Works v. Brennan*, 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974).

■ 10. Here, the plaintiff cannot recover under either standard. The defendant has met a burden of proving that its articulated reasons for the disparate wages are true reasons, and not a pretext for discrimination. Defendant has established the following legitimate, non-discriminatory reasons for the discrepancy in wages between plaintiff ($6.97 per hour) and Scott Barfield ($11.95 per hour), both of whom occupied the position of industrial engineering aide:

(a) plaintiff's salary was set in light of the fact that she was being placed in the job on a trial basis, and it was understood that her salary would be raised further if she performed acceptably;

(b) plaintiff did not have a four year engineering degree; Scott Barfield did. This difference in educational background justified an adjustment in salary, and it also justified defendant's decision to require that plaintiff complete a trial period to prove that she could meet the performance requirements of the job;

(c) Scott Barfield was hired as a temporary employee whose wages were unaccompanied by benefits. Plaintiff was a permanent employee, entitled to various benefits. The discrepancy that exists is narrowed when the value of plaintiff's benefits is added to her wage, although the exact value of those benefits is not discernible from the evidence.

11. When a Title VII claim of sex-based wage discrimination is made, an employer may defeat the claim by establishing that the differentiation is based on any "factor other than sex." 42 U.S.C. § 2000e–2(h) (incorporating 29 U.S.C. § 206(d) of the Equal Pay Act). Defendant has successfully proven that the discrepancy in pay between plaintiff and Scott Barfield was based on factors other than sex.

### Quid Pro Quo Sexual Harassment

■ 12. There are two varieties of sexual harassment which are prohibited under Title VII. Title VII prohibits both "hostile environment" sexual harassment and "*quid pro quo*" sexual harassment. *See Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

■ 13. Hostile environment sexual harassment exists when an employee is subjected to unwelcome sexual harassment that is "sufficently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Vinson*, 477 U.S. at 68, 106 S.Ct. at 2406, 91 L.Ed.2d at 60. Plaintiff has neither alleged nor proven that she was subjected to hostile environment sexual harassment.

■ 14. *Quid pro quo* sexual harassment exists when an employer requires sexual consideration from an employee as a *quid pro quo* for job benefits. To establish a prima facie case of *quid pro quo* sexual harassment, an employee must prove: (1) that she belongs to a protected group; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment complained of was based on sex; and (4) that the employee's reaction to the harassment affected tangible aspects of the employee's compensation, or terms, conditions or privileges of employment. *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554 (11th Cir.1987).

15. Plaintiff has established a *prima facie* case: (1) she belongs to a protected group; (2) she was subjected to unwelcome sexual harassment in the form of unwelcome sexual advances made by Mr. Skinner on a number of occasions; (3) the harassment was based on sex (this element is redundant of the second element); and (4) her reaction to the harassment (rejection of advances) affected tangible aspects of her compensation, and terms or conditions of employment (Mr. Skinner stood in the way of, and delayed, plaintiff's promotion to permanent industrial engineering aide with accompanying raise in salary).

16. Under the *McDonnell Douglas/Burdine* allocation of burdens of proof and production, once a plaintiff has established a *prima facie* case of discrimination, a burden of production shifts to the defendant, who must articulate a legitimate, non-discriminatory reason for its action. The burden of persuasion remains with the plaintiff to prove that the reasons advanced by the defendant are pretextual.

■ 17. Where a case of discrimination is proved by direct evidence, however, the *McDonnell Douglas* burdens are inapplicable. When there is "direct testimony that the defendant acted with a discriminatory motive, and the trier of fact accepts this testimony, the ultimate issue of discrimination is proved." *Bell v. Birmingham Linen Service*, 715 F.2d 1552, 1557 (11th Cir. 1983). When proof of discrimination is made with direct evidence, the defendant can rebut only by *proving* by a preponderance of the evidence that the same decision would have been reached even absent the presence of discrimination.

18. Plaintiff has presented direct evidence of discriminatory motive, which is accepted as credible by this Court. Plaintiff testified that Mr. Skinner made a number of sexual advances to her, many of them in the context of discussions about plaintiff's possible promotion. In the first week of February, 1986, after plaintiff made inquiry about her promotion, Mr. Skinner told plaintiff that if she played his game she would get what she wanted; and Skinner expressed his disappointment that plaintiff had not acceded to his sexual advances.

■ 19. Mr. Skinner, although not the ultimate decision maker, had a great amount of influence over plaintiff's awaited promotion and raise. He also was charged with carrying out the various bureaucratic steps necessary to finalize plaintiff's promotion and raise. Mr. Skinner had the power to prevent, or at least delay, plaintiff's promotion. This power, coupled with plaintiff's direct evidence of *quid pro quo* sexual harassment, is sufficient to shift the burden to the defendant to prove that plaintiff's promotion and raise were

delayed for legitimate, non-discriminatory reasons. *Bell v. Birmingham Linen Service, supra,* 715 F.2d at 1557. The burden on defendant is to prove that plaintiff's promotion would have been delayed even without the presence of Skinner's *quid pro quo* sexual harassment.

20. The defendant has failed to establish that plaintiff's promotion would have been delayed even absent discrimination. The evidence established that on September 11, 1985, Mr. Johnson recommended to Dr. Roberts that plaintiff's position be made permanent. Plaintiff was not a perfect employee, but her supervisor, Mr. Johnson, gave her a favorable evaluation on September 25, 1985, which was discussed orally with plaintiff on December 19, 1985. Mr. Johnson orally advised plaintiff to reduce her absences and phone use, but the evaluation was generally favorable. At some point late in 1985, or during the first weeks of 1986, Dr. Roberts directed Mr. Skinner to prepare a salary recommendation for making plaintiff's position permanent. It is at this point that plaintiff's promotion stalled. Mr. Skinner did not follow through on Dr. Robert's directive. In the first week of February, 1986, Mr. Skinner indicated to plaintiff that she would get what she wanted (her promotion) if she played his game (acceded to his sexual advances). The defendant has sought to establish that the delay in plaintiff's promotion was attributable to her attendance and phone use problems. The defendant's assertion of non-discriminatory reasons is not plausible, however, for reasons outlined in the findings of fact, *supra.*

21. Even if the traditional *McDonnell Douglas* allocation of burdens were applicable, plaintiff has carried the burden of proving, by a preponderance of evidence, that the reasons advanced by defendant are pretextual.

22. An employer is strictly liable for *quid pro quo* sexual harassment by its supervisors. *Sparks v. Pilot Freight Carriers,* 830 F.2d 1554, 1564 n. 22 (11th Cir.1987). This rule is drawn from agency principles, in that a supervisor engaging in *quid pro quo* sexual harassment is using "his apparent or actual authority to extort sexual consideration from an employee ... [T]he supervisor uses the means furnished to him by the employer to accomplish the prohibited purpose." *Henson v. City of Dundee,* 682 F.2d 897, 910 (11th Cir.1982).

23. While Mr. Skinner was not plaintiff's supervisor, he had sufficient apparent and actual authority over personnel decisions affecting her so as to make the defendant liable for his actions.

24. Title VII's definition of employer extends to "any agent of such [employer]." 42 U.S.C. § 2000e(b).

25. In *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Supreme Court held that courts should look to agency principles in defining the scope of an employer's liability for sexual harassment.

26. In *Sparks v. Pilot Freight Carriers,* 830 F.2d 1554 (11th Cir.1987), the Eleventh Circuit affirmed the view that whenever an employee engaging in sexual harassment is "aided in accomplishing the tort by the existence of the agency relationship," the employer should be held directly liable. *See* Restatement (Second) of Agency § 219(2)(d). Here, Mr. Skinner subjected plaintiff to *quid pro quo* sexual harassment by exercising the apparent and actual authority delegated to him by the defendant. Accordingly, the defendant is liable for the acts of Skinner constituting *quid pro quo* sexual harassment.

### Retaliation

27. Under Title VII, employers are prohibited from discriminating against an employee who has either (1) opposed an employment practice made unlawful under Title VII, or (2) made a charge, or participated in any manner in an investigation, proceeding, or hearing under Title VII. 42 U.S.C. § 2000e–3(a).

28. A *prima facie* case of retaliation prohibited under Title VII is established by proof that (1) plaintiff engaged in statutorily protected opposition or participation; (2) an adverse employment action

occurred; and (3) there was a causal link between the opposition or participation and the adverse employment action. *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir.1985).

29. Clearly, plaintiff has engaged in statutorialy protected activity, and has proven the first element of her *prima facie* case.

30. The following adverse employment actions occurred subsequent to plaintiff engaging in protected activity:

(a) Dr. Roberts prepared a memo of the February 7, 1986 meeting, focusing inaccurately and without justification on plaintiff's absenteeism and phone use instead of on plaintiff's allegations;

(b) Mr. Johnson issued a written reprimand on February 11, 1986, referring to plaintiff's absenteeism and phone use;

(c) defendant continued to withhold plaintiff's promotion and raise;

(d) Mr. Johnson issued a final warning memo on April 2, 1986, referring to a complaint about plaintiff spending too much time talking to mechanics;

(e) upon her return to work, plaintiff was assigned to a position in the accounting department, which position amounted to a substantial demotion in terms of work conditions, job-duties, and career advancement potential.

Clearly, plaintiff has established the second element of her *prima facie* case.

31. The "causal link" element requires merely that the plaintiff establish that the protected activity and the adverse action "were not wholly unrelated." *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir.1985).

32. The causal link element of a *prima facie* case can be established when only a short period of time passes between the protected activity and the adverse personnel action complained of. *Eastland v. Tennessee Valley Authority*, 704 F.2d 613, 627 (11th Cir.1983). Here, the first two adverse employment actions taken followed only days after plaintiff first notified Kemira management of her charges against Mr. Skinner.

33. The causal connection may also be established by proof that plaintiff received favorable performance evaluations before engaging in protected activity, and negative evaluations after she engaged in protected activity. *See Rutherford v. American Bank of Commerce*, 565 F.2d 1162, 1164 (10th Cir.1977).

34. Plaintiff has established the third element of her *prima facie* case of retaliation.

35. Plaintiff's evidence of retaliation is circumstantial. Thus, the shifting burdens of *McDonnell Douglas* are applicable. The defendant must rebut plaintiff's *prima facie* case by articulating some legitimate, non-discriminatory reason for the adverse employment actions. The plaintiff must then prove by a preponderance of the evidence that the reasons articulated by the defendant are pretextual. *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir.1985).

36. Defendant has articulated the following legitimate non-discriminatory reasons for the adverse actions taken against plaintiff:

(1) poor work performance, i.e., excessive absences, excessive use of the phone, and excessive talking with mechanics;

(2) with respect to placement of plaintiff in the accounting department, it was necessary to place plaintiff under a female supervisor to avoid further problems.

37. For reasons outlined in the findings of fact, plaintiff has proven that the non-discriminatory reasons advanced by defendant for the adverse actions taken were pretextual. Plaintiff has met her burden with evidence that (1) before she engaged in protected activity, her performance evaluation was favorable; (2) written reprimands followed closely on the heels of the protected activity; (3) the timing of written reprimands relating to plaintiff's attendance did not make any sense in relation to her actual attendance record; (4) discipline in the form of a final warning memo referring to plaintiff talking too much to mechanics was unwarranted and in violation

of defendant's progressive discipline policy; (5) defendant's assertion that it was necessary to place plaintiff under a female supervisor in order to "remedy the situation" was implausible because plaintiff's complaint was essentially against Mr. Skinner, the Manager of the Department of Human Resources, and not against her supervisor, Mr. Johnson; (6) even conceding that placement of plaintiff under a female supervisor was a good faith measure, there was no justification for relegating plaintiff to menial tasks at a work station equivalent to a dunce cap.

## Damages

38. "It is the duty of [a] district court, after a finding of discrimination, to place the injured party in the position he or she would have been absent the discriminatory actions." *Nord v. United States Steel Corp.*, 758 F.2d 1462, 1470 (11th Cir.1985). The basic purpose of Title VII relief is to "make whole" victims of unlawful discrimination. *Albemarle Paper Company v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975). A district court has broad discretion to fashion remedies as the equities of a particular case compel. *Harper v. Thiokol Chemical Corp.*, 619 F.2d 489, 494 (5th Cir.1980). "Congress' purpose in vesting a variety of 'discretionary' powers in the courts was ... to make possible the 'fashioning of the most complete relief possible.' " *Albemarle Paper Company v. Moody*, 422 U.S. at 421, 95 S.Ct. at 2373.

39. Plaintiff is presumptively entitled to back pay, including benefits. *Albemarle Paper Company v. Moody*, 422 U.S. 405, 417–23, 95 S.Ct. 2362, 2371–74, 45 L.Ed.2d 280 (1975).

40. Plaintiff has established that, if not for *quid pro quo* sexual harassment and retaliation by defendant, she would have been promoted to the position of permanent industrial engineering aide and her salary would have been increased. The precise date her promotion would have been finalized, and the precise amount of the raise she would have received, are uncertain.

41. In calculating a back pay award, it is appropriate to resolve uncertainties against the discriminating employer, and not the victim. *Horn v. Duke Homes, Division of Windsor Mobile Homes, Inc.*, 755 F.2d 599, 607 (7th Cir. 1985); *Goss v. Exxon Office Systems Co.*, 747 F.2d 885, 889 (3rd Cir.1984). Unrealistic exactitude is not required, *Stewart v. General Motors Co.*, 542 F.2d 445, 452 (7th Cir.1976), and the fact that a back pay award is difficult to calculate does not justify denying a back pay award. *Rasimas v. Michigan Dept. of Mental Health*, 714 F.2d 614, 626 (6th Cir.1983). With the foregoing principles in mind, I find that the appropriate back pay award for plaintiff is one that reflects her promotion as having been finalized on January 1, 1986, with her salary increased on that date to $1,830.00 per month.

42. All interim wages and disability benefits received shall be applied to offset plaintiff's back pay award. This is appropriate because the purpose of Title VII remedies is to "make whole" a victim of discrimination, not to provide a windfall. *Albemarle Paper Company v. Moody*, 422 U.S. 405, 419, 95 S.Ct. 2362, 2372, 45 L.Ed. 2d 280 (1974).

43. Courts have generally excluded periods of unavailability, such as periods of disability, from computation of back pay awards. *See Ostapowicz v. Johnson*, 541 F.2d 394, 401 (3rd Cir.1976); *Walston v. School Bd. of Suffolk*, 566 F.2d 1201, 1206 (4th Cir.1977). A different rule is justified when the disability would not have occurred but for the employer's discrimination. *See White v. Carolina Paperboard Corp.*, 564 F.2d 1073, 1091 (4th Cir.1977) (where disability began after time when, absent discrimination, plaintiff would have been promoted to position not entailing strenuous work which caused injury, back pay should be computed as if disability never existed); *Arnold v. City of Seminole*, 614 F.Supp. 853 (E.D.Okla.1985) (where sexual harassment complained of caused psychological disability, back and front pay awarded inclusive of disability period). Accordingly, plaintiff's back pay

award (and front pay, *see infra*) shall be inclusive of her periods of disability. This is consistent with the Court's duty to fashion a remedy as the equities of the case compel.[1]

44. A plaintiff is required to make reasonable efforts to mitigate damages by seeking alternative employment. 42 U.S.C. § 2000e–5(g). The burden of proving a lack of diligence in mitigating damages is on the defendant. *Smith v. American Service Company of Atlanta*, 796 F.2d 1430, 1431 (11th Cir.1986). Defendant has not carried this burden. Plaintiff introduced evidence that she made reasonable efforts to obtain alternative employment. Defendant offered plaintiff's decision to forego an offer of employment from Boeing, Georgia, Inc., in Macon, Georgia, as proof of a failure to mitigate. Plaintiff's decision not to move to Macon from Savannah, however, was reasonable in the circumstances.

45. Plaintiff is entitled to have her back pay award supplemented by an award of prejudgment interest, to be calculated in the manner set out in *Walters v. City of Atlanta*, 610 F.Supp. 715, 728 (N.D. Ga.1985), *rev'd on other grounds*, 803 F.2d 1135 (11th Cir.1986).

46. Title VII claimants are also presumptively entitled to reinstatement under the "make whole" policy of the Act. *Nord v. United States Steel Corp.*, 758 F.2d 1462, 1473 (11th Cir.1985). As an alternative to reinstatement, front pay can be ordered. *Id.* Front pay is appropriate when a plaintiff is entitled to reinstatement, but a hostile or otherwise unsuitable work environment counsels against reinstatement. *Goldstein v. Manhattan Industries, Inc.*, 758 F.2d 1435, 1449 (11th Cir.1985); *Goss v. Exxon Office Systems Co.*, 747 F.2d 885, 889–90 (3rd Cir.1984). This is such a case. Plaintiff's psychiatrist has advised her not to return to work at Kemira, and the Court accepts this medical judgment. Further, ill-feelings engendered on both sides by the circumstances of this somewhat bitterly contested lawsuit are likely irremediable.

47. Plaintiff shall be awarded front pay at the same rate as her back pay award: $1,830.00 per month. Consistent with the "make whole" purpose of Title VII remedies, I find that a nine-month lump sum front pay award will accomplish that purpose. This will allow plaintiff sufficient time to (1) obtain additional psychiatric treatment and recover from her disability, and (2) find equivalent alternative employment. Although it is possible that plaintiff's disability will continue beyond nine months, at some point continued front pay would unfairly penalize defendant for various contributing causes of plaintiff's psychiatric problems which predated her employment at Kemira. I find that a lump sum is preferable to a monthly payment, which would require a continual monitoring of plaintiff's interim earnings and efforts to mitigate damages. The nine month period arrived at represents my best estimate of an award that will make plaintiff whole.

### Attorney's Fees

48. In Title VII actions, reasonable attorney's fees are recoverable by pre-

---

1. An alternative basis for including plaintiff's period of disability in her back pay award is under the doctrine of constructive discharge. Plaintiff has argued that her disability should be equated to a resignation under employment conditions amounting to a constructive discharge. A constructive discharge occurs when working conditions are so difficult or unpleasant that a reasonable person would feel compelled to resign. *Bourque v. Powell Electrical Mfg. Co.*, 617 F.2d 61, 65 (5th Cir.1980). It could be argued that every instance of *quid pro quo* sexual harassment *per se* constitutes a constructive discharge. In any event, when plaintiff brought her allegations to the attention of Kemira management, and management failed to adequately investigate or remedy the situation, but instead responded with retaliation, plaintiff's work situation became so intolerable that a reasonable person would have felt compelled to resign. The situation was exacerbated further when plaintiff returned to work and was assigned to the accounting department. Accordingly, I find that plaintiff was constructively discharged at the time she became disabled. *See Coley v. Consolidated Rail Corp.*, 561 F.Supp. 645, 651 (E.D.Mich.1982). The difficulty in applying a constructive discharge analysis to the present case arises from the fact that plaintiff's day to day work conditions were not intolerably difficult, as in the typical constructive discharge case. Rather, the sequence of events constituted such an affront that a reasonable person would have felt compelled to resign.

vailing plaintiffs as a part of costs. 42 U.S.C. § 2000e–5(k). Reasonable attorney's fees should be awarded absent special circumstances. *Christianburg Garment Co. v. EEOC,* 434 U.S. 412, 417, 98 S.Ct. 694, 698, 54 L.Ed.2d 648 (1978). Plaintiff is entitled to recover costs and attorney's fees in this action.

49. The starting point in determining an objective estimate of the value of attorney's services is to multiply hours reasonably expended by a reasonable hourly rate. *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed. 2d 40 (1983). Taking into account the prevailing market rates in the Savannah community for similar services by lawyers of reasonably comparable skills, experience, and reputation, I find that a reasonable hourly rate for Mr. Lasky's and Ms. Bunce's services is $100.00 per hour; and a reasonable hourly rate for Mr. Ashman's services is $125.00.

50. Excessive, redundant, or otherwise unnecessary hours should be excluded from an award of attorney's fees. *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1939. "Redundant hours generally occur where more than one attorney represents a client." *Norman v. Housing Authority of Montgomery,* 836 F.2d 1292, 1301 (11th Cir.1988). While there is nothing inherently unreasonable about multiple representation, in this case the use of three attorneys to handle plaintiff's case was unnecessary. For reasons outlined in the findings of fact, the hours submitted by Mr. Lasky and Ms. Bunce shall be compensated in full, but Mr. Ashman's hours shall be reduced to ten.

51. In determining reasonable hours, a district court must deduct time spent on discrete and unsuccessful claims. *Hensley,* 461 U.S. at 435, 103 S.Ct. at 1940. Here, plaintiff did not prevail on her wage discrimination claim. It appears that a significant percentage of separable hours were spent on the wage discrimination claim. Accordingly, a total adjustment of $12,000.00 shall be made for time spent on the wage discrimination claim.

52. Plaintiff has a concurrent action pending in state court. It appears that the factual issues in the state action substantially mirror the factual issues in this action. Thus, it does not appear that any hours spent preparing this case are excludable as having been necessary only to the state court action.

53. Plaintiff is also entitled to recover reasonable paralegal fees. *Richardson v. Byrd,* 709 F.2d 1016, 1023 (5th Cir. 1983). The paralegal fees sought here are reasonable because the work done was of a nature that has traditionally been performed by attorneys (e.g., summarizing depositions). Thus, use of paralegals was actually a cost-saving measure. The $45.00 hourly rate charged is consistent with prevailing local rates.

## CONCLUSION

Based on the foregoing findings of fact and conclusions of law, it is hereby ORDERED that judgment shall be entered in favor of plaintiff. It is further ORDERED that:

1. Defendant shall pay to plaintiff back pay in the amount of $10,070.40 for the year of 1986 (amount includes offset for earned income and disability benefits received);

2. Defendant shall pay to plaintiff back pay in the amount of $16,020.84 for the year of 1987 (amount includes offset for earned income and disability benefits received);

3. Defendant shall pay to plaintiff back pay in the amount of $2,836.50 for the period from January 1, 1988 through February 16, 1988 (this amount does not include an offset for disability benefits received, which are unknown; any disability benefits received by plaintiff during this period shall be applied to offset the award);

4. Defendant shall pay to plaintiff prejudgment interest on the back pay award, to be calculated in the manner outlined in *Walters v. City of Atlanta,* 610 F.Supp. 715, 728 (N.D.Ga.1985).

5. Defendant shall pay to plaintiff a lump sum front pay award of $16,470 (No

 

disability benefits or wages shall be applied to offset this amount because they have been taken into account in setting the award, and because the purpose of awarding a lump sum is to eliminate the need to monitor plaintiff's income from other sources).

6. Defendant shall pay to plaintiff attorney's fees in the amount of $59,235.00, plus paralegal costs in the amount of $5,332.50.

7. Plaintiff shall submit a bill of costs to the Clerk, which shall include only costs authorized under 28 U.S.C. § 1920.

SO ORDERED.[2]

**2.** The Court takes no pleasure in its role as factfinder in this type of case. A charge of sexual harassment is analogous to a charge of rape, insofar as "this type of accusation is one easy to make, hard to prove and harder to defend." *Wright v. Lester*, 105 Ga.App. 107, 116, 123 S.E.2d 672 (1961). That observation has been borne out in the trial of this case, which has forced the making of very difficult credibility choices, and which has produced, and will continue to produce, consequences far beyond the immediate impact of this Order.