**Tracy BERTOTTI, Plaintiff,**

v.

**PHILBECK, INC., Debi Fry, and William Forehand, Defendants.**

**Civ. A. No. CV292–292.**

United States District Court,
S.D. Georgia,
Brunswick Division.

July 23, 1993.

John Thomas McKnight, Jr., Brunswick, GA, for plaintiff.

Ryburn Clay Ratterree, Savannah, GA, James H. Moore, III, Albany, GA, for defendants.

## ORDER

ALAIMO, District Judge.

On December 22, 1992, Plaintiff, Tracy Bertotti ("Bertotti"), instituted this federal question action, alleging violations of: (1) the Equal Pay Act of 1963 ("the EPA"), 29 U.S.C. § 206(d) (1988); (2) Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* (1988); and, (3) state tort and contract law. Bertotti contends that: (1) she was paid lower wages than employees of the opposite sex, in violation of the EPA and Title VII; (2) she was discharged by Defendants in retaliation for her confronting Defendants with the disparity, in violation of the EPA and Title VII; (3) Defendants breached an employment agreement; and, (4) Defendant, Debi Fry ("Fry"), defamed Bertotti in statements made to the Equal Employment Opportunity Commission ("EEOC") and in references to Bertotti's potential subsequent employers. This action is presently before the Court on two motions by Defendants for partial summary judgment, addressing all of Bertotti's claims, pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the following reasons, summary judgment will be **GRANTED** in favor of Defendants.

### FACTS

Defendant, Philbeck, Inc. ("Philbeck), is a domestic corporation, authorized to do business in the State of Georgia. Philbeck owns and operates the Ramada Inn on Jekyll Island, Georgia. Defendant, William Forehand ("Forehand"), serves as the Vice President and Director of Philbeck, and Fry serves as the General Manager of the Jekyll Island Ramada Inn. On June 6, 1991, Bertotti began employment at the Ramada Inn as the Executive Chef and Director of Food and Beverage.[1] (Compl. at ¶ 10). Bertotti contends that on the date that she was hired by Fry, June 3, 1991, she and Fry entered into an employment agreement. Bertotti does not have a completed copy of the employment agreement but only has a draft copy signed solely by herself. She contends, however, that the employment agreement consisted of the following terms:

1. Weekly salary position of $450.00.

2. Weekly salary is to remain the same for a ninety-day period. A review will then be provided.

3. Family health insurance will be provided by employer and paid by employer as of start date.

4. Uniforms are to be supplied by employer.

5. I, Tracy Bertotti, agree to the position of Executive Chef/Food and Beverage Director. I also agree to all the responsibilities of said department.

6. I agree, being a management person, to work however many hours necessary to maintain this department.

7. Terms of this agreement will remain for a period of eighteen months with the exception of salary.

8. A two percent commission will be provided by employer from the Food and Beverage Department.

9. The running and conduct of this Department are to be assigned by myself, Tracy Bertotti, as head of the Department.

(Compl. at ¶ 26). Bertotti claims that, subsequent to the completion of the employment agreement, Fry unilaterally reduced the salary to $400.00 per week. *Id.* at ¶ 27.

---

1. Defendants contend that Bertotti was merely hired as a cook. Nevertheless, for purposes of their motion for summary judgment, they state that they will assume, as Bertotti alleges, that she was hired as the Executive Chef and Director of Food and Beverage.

In response, Fry contends that the Ramada Inn does not enter into employment contracts with any of its employees. (Fry Dep. at 19). She states that in the employment negotiations with Bertotti, the only salary amounts discussed were either $450.00 or $400.00 per week. (Fry Aff. at ¶ 11). Fry contends that, ultimately, the lower $400.00 per week figure was agreed to because, in addition to the salary, the Ramada Inn also agreed to pay Bertotti's family health insurance which was $353.56 per month. (Fry Dep. at 21). According to Fry, the Ramada Inn does not normally pay insurance for its employees, but Defendants accepted Bertotti's request for such payments in return for the lower weekly salary. *Id.*

After Bertotti received her first paycheck, paid on a semi-monthly basis, Bertotti discovered that she was only paid $833.34, or annualized, $20,000.00. This amount represents $3,500.00 less per year than a salary based upon $450.00 per week and even $800.00 less than a salary based upon $400.00 per week. Bertotti contends that she informed Fry that her paycheck was not for $450.00 per week, and Fry stated that there were some "problems," and the discrepancy would be worked out. (Bertotti Dep. at 64). In contrast, Fry claims that the agreed salary was never $450.00 but only $400.00 per week, and the discrepancy between what was actually paid was merely a bookkeeping error that Fry did not discover until after Bertotti's termination. (Fry Aff. at 4).

At approximately the same time that Bertotti was hired, Norman Wiley ("Wiley"), a male, was also hired by the Ramada Inn as a Sous Chef. (Compl. at ¶ 11). In her third week of employment, Bertotti came across a payroll listing that indicated that Wiley's semi-monthly pay was $866.67, or annualized, $20,800.00. Compared to the semi-monthly pay for Bertotti, Wiley was, therefore, paid $33.33 more than Bertotti per pay period or, annualized, $800.00 more. Bertotti contends

that she brought this pay differential to the attention of Fry, and Fry's response was that the difference was "not right," and she would discuss the matter with Forehand and resolve the issue. (Bertotti Dep. at 82).

Fry insists that she was not aware of the difference between the amounts paid to Bertotti and Wiley until after the termination of Bertotti's employment. (Fry Aff. at ¶ 17). As such, she states that she never discussed the matter with either Bertotti or Forehand. Fry claims that both Bertotti and Wiley were to receive $400.00 per week, with Bertotti also having her health insurance paid by Ramada. *Id.* Again, Fry contends that the differential was merely a bookkeeping error that did not come to her attention until after Bertotti's employment was terminated. *Id.*

On July 1, 1991, after only two pay periods, Forehand terminated Bertotti's employment. (Compl. at ¶ 22). Forehand states that the decision to terminate Bertotti's employment was made by him alone. (Forehand Aff. at ¶ 6). Forehand contends that he terminated Bertotti's employment for two reasons. First, he claims that he discovered that "during the month of June 1991, on more than one occasion, [Bertotti] comped rooms, that is, [she] directed [the] front desk employees to provide rooms at no charge to individuals, [while] representing herself to be the Food and Beverage Director of the Ramada Inn, which she was not[, and she] had no authority to comp rooms...." *Id.* at ¶ 9. Second, Forehand alleges that Bertotti, without authority, ordered a piece of kitchen equipment, costing approximately $5,000.00. *Id.* at ¶¶ 13–14. Forehand states that he, therefore, terminated Bertotti's employment.

Bertotti filed a charge with the EEOC, alleging discrimination on the basis of sex based upon the higher wages paid to Wiley. After completion of the EEOC's investigation, Bertotti received her right-to-sue letter on September 25, 1992.[2] Bertotti filed this

---

2. The EEOC concluded that there was no evidence of a statutory violation. In its Determination letter, the EEOC stated in part:

Charging Party alleged that she was discriminated against by being paid lower wages than her male counterparts and by being discharged from her position because of her sex, female,

in violation of Title VII of the Civil Rights Act of 1964, as amended.

Examination of the evidence indicates that Charging Party was discharged from her position as Executive Chef on July 1, 1991 because her performance did not meet Respondent's standards. Charging Party's allegations re-

instant action within the statutorily required ninety-day period after receipt of her right-to-sue letter. She contends that she was paid less than Wiley, in violation of the EPA. Moreover, after the filing of her original charge with the EEOC, Bertotti discovered that Defendants, in April of 1992, hired a Food and Beverage Director, Michael Pollard ("Pollard"), at a salary of $25,000.00 per year. Bertotti contends that Pollard performs the same duties as she did, and his higher salary is similarly a violation of the EPA.[3] In addition, Bertotti claims that the true reason that she was fired was for seeking to enforce her rights under the EPA and, thus, she includes a claim of retaliatory discharge. Finally, Bertotti asserts state law claims for breach of the employment contract and for defamation based upon improper statements made by Fry to the EEOC and to subsequent prospective employers for Bertotti.

In response, Defendants contend that Bertotti has failed to establish a *prima facie* violation of the EPA. Defendants argue that when the health insurance benefits are considered, Bertotti was paid more than either Wiley or Pollard, both of whom did not receive insurance benefits. Moreover, Defendants note that during the short time of her employment with the Ramada Inn, Bertotti was given a $750.00 advance on her salary. Upon the termination of her employment, Forehand informed Bertotti that there was no need for Bertotti to reimburse the Ramada Inn for the advance, and Bertotti could consider the amount severance pay. This amount, Defendants insist, only further increases the differential between the higher wages paid to Bertotti compared to Wiley and Pollard. In addition, Defendants argue that Bertotti was discharged for legitimate,

nonretaliatory reasons. Finally, Defendants contend that there was no employment agreement, and the statements made to the EEOC and any prospective employers were privileged, rendering any defamation claim meritless.

## DISCUSSION

### I. Standard for Summary Judgment

Summary judgment requires the movant to establish the absence of genuine issues of material fact, such that the movant is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153, 90 S.Ct. 1598, 1606, 26 L.Ed.2d 142 (1970). Summary judgment is also proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The non-moving party to a summary judgment motion need make this showing only after the moving party has satisfied its burden. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991). The court should consider the pleadings, depositions and affidavits in the case before reaching its decision, Fed. R.Civ.P. 56(c), and all reasonable inferences will be made in favor of the non-movant. *Adickes*, 398 U.S. at 158–59, 90 S.Ct. at 1608–09.

### II. Federal Employment Claims

#### A. Equal Pay Act Claim

To establish a *prima facie* claim under the EPA,[4] a plaintiff must show that

---

garding wages and references are not substantiated in the evidence of record.

No evidence was presented that shows Charging Party's sex was a factor in Respondent's decision to terminate her employment.

Based on this analysis, I have determined that the evidence obtained during the investigation does not establish a violation of the statute.

3. Defendants argue that Bertotti was not the Food and Beverage Director and, therefore, it is inappropriate to compare Bertotti's wages to Pollard's. Nevertheless, in their motion for summary judgment, Defendants state that they will

assume, as Bertotti alleges, that the position held by Pollard is comparable to Bertotti's prior job.

4. The EPA, in pertinent part, states:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and

the "employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974) (quoting 29 U.S.C. § 206(d)(1)); *see also Beavers v. American Cast Iron Pipe Co.,* 975 F.2d 792 (11th Cir. 1992); *Brock v. Georgia Southwestern College,* 765 F.2d 1026 (11th Cir.1985); *Jones v. Westside–Urban Health Ctr., Inc.,* 760 F.Supp. 1575 (S.D.Ga.1991); *see generally* Jerald J. Director, Annotation, *Construction and Application of Provisions of Equal Pay Act of 1963 (29 USC § 206(d)) Prohibiting Wage Discrimination on Basis of Sex,* 7 A.L.R.Fed. 707 (1971 & Supp.1992). "Under the EPA, the term 'wages' generally includes all payments made to [or on behalf of] an employee as remuneration for employment. The term includes all forms of compensation irrespective of the time of payment, whether paid periodically or deferred until a later date, and whether called wages, salary, profit sharing, expense account, monthly minimum, bonus, uniform cleaning allowance, hotel accommodations, use of company car, gasoline allowance, or some other name. Fringe benefits are deemed to be remuneration for employment." 29 C.F.R. § 1620.10 (1992).

■ In the present action, Bertotti has failed to demonstrate that her wages were less than either of her "comparators," Wiley or Pollard. Bertotti contends that her agreed to salary was $450.00 per week, but she claims that Fry unilaterally reduced the salary to $400.00 per week. For purposes of comparison, this Court will rely upon the lower figure to determine whether Bertotti's wages were, in fact, lower than her comparators. Bertotti's agreed to wages of $400.00 per week constitute $20,800.00 when annualized. When combined with the monthly insurance payments of $353.56—annualized to $4,242.72—Bertotti's annual, agreed upon, wages were $25,042.72. This amount is in excess of Wiley's annual wages of $20,800.00 or Pollard's annual wages of $25,000.00.

■ Bertotti argues that the amount actually paid to her during the two pay periods while she was with the Ramada Inn was, in fact, less than $400.00 per week. Moreover, she claims that during that period, no insurance payments were made. As such, Bertotti contends that, regardless of the agreed upon wages, the actual wages paid during her employment were less than those paid to her comparators. Based upon this actual payment argument, Bertotti has, similarly, failed to establish a claim under the EPA. The actual amounts paid to Bertotti were two payments for $833.34 plus the $750.00 advance/severance payment, which totals $2,416.68. During those same two pay periods, Wiley received two payments for $866.67, which totals $1,733.34. A comparable period for Pollard, *i.e.,* $25,000.00 divided by twelve months, results in wages of $2,083.33. Bertotti's actual wages received were, therefore, greater than either comparator, and her EPA claim must fail.[5]

## B. Title VII Claim

■ "In situations where the jurisdictional prerequisites of both the EPA and

---

which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided,* That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.
29 U.S.C. § 206(d)(1) (1988).

**5.** Bertotti attempts to argue that the amounts to be compared should be $20,000.00 (the $833.34 semi-monthly payments actually paid, annualized) plus the insurance payments of $4,272.72. Bertotti contends that the total of such an approach, $24,272.72, is less than the $25,000.00 salary for Pollard. This approach is unwarranted. All of the evidence indicates that the only salary amounts considered were either $450.00 or $400.00 per week. Bertotti presents no evidence that, had her employment not been terminated, the $833.34 payments would have continued and should be the basis for her wage comparison. Nevertheless, accepting Bertotti's contention, she ignores the advance/severance payment of $750.00 that she received. Including the $750.00, Bertotti's total was only $7.00 less than Pollard's $25,000.00 salary. This Court is unwilling to find that this 0.03% difference from the salary of Pollard, a man hired more than nine months after the termination of Bertotti's employment, is sufficient to sustain an EPA action.

[T]itle VII ... are satisfied, any violation of the [EPA] is also a violation of [T]itle VII. However, [T]itle VII covers types of wage discrimination not actionable under the EPA. Therefore, an act or practice of an employer ... that is not a violation of the EPA may nevertheless be a violation of [T]itle VII." 29 C.F.R. § 1620.27 (1992). In *County of Washington v. Gunther*, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981), the Supreme Court noted that Title VII was intended to cover a broader range of employment practices than the EPA. The Court stated that limiting Title VII to the standards of the EPA would require that:

> [a] woman who is discriminatorily underpaid could obtain no relief—no matter how egregious the discrimination might be— unless her employer also employed a man in an equal job at the same establishment, at a higher rate of pay.

*Id.* at 178, 101 S.Ct. at 2252. *See generally* Martin M. Heit, Annotation, *Wage Differentials as Violative of those Provisions of Title VII of the Civil Rights Act of 1964 (42 USCS §§ 2000e et seq.), which Prohibit Sex Discrimination in Employment*, 62 A.L.R.Fed. 33 (1983 & Supp.1992). Accordingly, "[t]he Court[, in *Gunther*,] held that Congress did not intend such an anomalous result and thus, a Title VII plaintiff could prevail if she could prove unfair treatment and an intent to discriminate." *EEOC v. Reichhold Chems., Inc.*, 988 F.2d 1564, 1570 (11th Cir.1993) (citing *Gunther*, 452 U.S. at 179–80, 101 S.Ct. at 2253).

In the present action, Bertotti has presented no direct evidence of an intent to discriminate. Instead, she attempts to establish a Title VII claim based upon circumstantial evidence by arguing that her wages were less than male employees placed in equal jobs. As discussed above, however, the evidence does not support Bertotti's claim that she was subjected to disparate treatment due to her sex. Bertotti's wages were not less than Wiley or Pollard, as she argues, and, thus, any Title VII claim of sex discrimination must fail. Accordingly, summary judgment, in favor of Defendants, is appropriate for any Title VII wage differential claim.

**C. Retaliation Claim**

Bertotti claims that the reasons for her discharge were pretextual, and the actual reason that she was discharged was because she inquired into the disparity between the wages paid to her and Wiley. As such, she contends that her employment was terminated in retaliation of her attempt to pursue her statutory protections against sex discrimination. Although the EPA does not provide a remedy for the enforcement of retaliation claims, Title VII provides that:

> [i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a) (1988). The Eleventh Circuit noted that under "the terms of section 2000e, employers are prohibited from retaliating for any action alleging sex discrimination, whether it was brought under Title VII or another act of Congress." *Wu v. Thomas*, 863 F.2d 1543, 1546 n. 5 (11th Cir. 1989). As such, "the retaliation provisions of section 2000e encompass suits brought to remedy retaliatory action resulting from the prosecution of a claim under the [EPA]." *Id.*

In *EEOC v. Reichhold Chems., Inc.*, 988 F.2d 1564 (11th Cir.1993), the Eleventh Circuit noted that in a retaliation claim, a plaintiff

> establishes a prima facie case under Title VII by showing that she exercised her protected rights, an adverse employment action occurred, and the adverse action was causally related to the plaintiff's protected activities. *Hamm v. Members of the Board of Regents*, 708 F.2d 647, 654 (11th Cir.1983). This court has interpreted the causal link requirement broadly; a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated. *Simmons v. Camden County Bd. of Ed.*, 757 F.2d 1187, 1189 (11th Cir.), *cert. denied*, 474 U.S. 981, 106 S.Ct. 385, 88

L.Ed.2d 338 (1985). The burden of production then shifts to the defendant to establish non-retaliatory reasons for the employment actions. *Tipton v. Canadian Imperial Bank of Commerce,* 872 F.2d 1491, 1494–95 (11th Cir.1989). The plaintiff can refute these reasons by proving that they are pretextual. *Id.* Again, the burden of production shifts, but the burden of persuasion remains with the plaintiff. *Id.*

*Id.* at 1571–72. *See also McCollum v. Bolger,* 794 F.2d 602, 610–11 (11th Cir.1986), *cert. denied,* 479 U.S. 1034, 107 S.Ct. 883, 93 L.Ed.2d 836 (1987); *Sowers v. Kemira, Inc.,* 701 F.Supp. 809, 824–26 (S.D.Ga.1988).

This Court has recognized that a "causal link" may be established upon a showing that "only a short period of time passes between the protected activity and the adverse personnel action complained of." *Sowers,* 701 F.Supp. at 825 (citing *Eastland v. Tennessee Valley Auth.,* 704 F.2d 613, 627 (11th Cir. 1983)). In addition, such a link may be shown by "proof that plaintiff received favorable performance evaluations before engaging in protected activity, and negative evaluations after she engaged in protected activity." *Id.* (citing *Rutherford v. American Bank of Commerce,* 565 F.2d 1162, 1164 (10th Cir. 1977)).

■ In the present action, both of the above means of establishing a causal link are difficult to apply because of the short duration of Bertotti's employment. Nevertheless, due to the broad interpretation generally given to this requirement and the short period of time between Bertotti's alleged confrontation of Fry and Bertotti's subsequent termination, this Court will assume that Bertotti has demonstrated a causal link. In addition, this Court finds that Bertotti's alleged inquiry of Fry regarding the pay disparity and Bertotti's termination are sufficient to meet the other two requirements for a retaliation claim: (1) the exercise of a protected right; and, (2) an adverse employment action resulting therefrom.

To rebut Bertotti's *prima facie* case of retaliatory discharge, Defendants articulate two legitimate non-discriminatory reasons for the employment termination. First, Defen-

dants contend that Bertotti, without authority, arranged to have rooms comped. Second, Defendants argue that Bertotti ordered a $5,000.00 piece of equipment for the kitchen without authority. In response to the alleged ordering of kitchen equipment, Bertotti presents the deposition of William K. Edwards ("Edwards"), a restaurant equipment salesperson. Edwards testified that, although he tried to sell a pressure steamer to Bertotti and Fry, the steamer was never ordered and an attempted delivery was never made. (Edwards Dep. at 4–6). As such, Bertotti has at least demonstrated the existence of a genuine issue of material fact whether or not an attempt of delivery of the equipment was ever made, as Forehand alleges.

■ With regard to the comping of rooms, Bertotti does not dispute that she arranged to have a busboy receive a room for free. She contends that she had the room comped so that the kitchen employee could be present first thing in the morning to arrange for repairmen to fix a broken piece of equipment. Accepting Bertotti's contention as true, that she comped the room in what she believed to be the best interests of Defendants, she does not satisfy her burden of showing Defendants' rationale for terminating her employment was mere pretext. Regardless of her purpose, there is no dispute that Bertotti did arrange to comp a room and, as Defendants contend, she was without authority to engage in such an act. Bertotti has failed to demonstrate a mere pretext and, thus, she cannot sustain her retaliatory discharge claim. As such, summary judgment will be granted to Defendants on this claim.

### III. *Breach of Employment Contract Claim*

■ Under Georgia law, an employment contract for a period of eighteen months, as Bertotti alleges existed, must be in writing. O.C.G.A. § 13–5–30(5) (1982) (stating "[a]ny agreement that is not to be performed within one year from the making thereof" must "be in writing and signed by the party charged therewith"). As the party asserting the exis-

tence of an employment agreement, Bertotti has the burden of proving the existence of the contract and its terms. *Foreman v. Eastern Foods, Inc.,* 195 Ga.App. 332, 333, 393 S.E.2d 695 (1990). Bertotti has failed to present a completed contract between herself and Defendants. Instead, she has merely presented a copy of a draft, that she concedes is not the final agreement, and is only signed by herself.

■ Nevertheless, assuming, *arguendo,* that a final executed agreement existed in the form alleged by Bertotti, such a contract would be insufficient for this Court to enforce. "In a contract for the performance of services by one party in consideration of the payment of money by the other party, the nature and character of the services to be performed as well as the place of performance and the amount to be paid must be certain and definite." *McTerry v. Free For All Missionary Baptist Church,* 129 Ga.App. 724, 724, 200 S.E.2d 915 (1973). It is debatable whether or not the terms regarding the nature and character of the services and the place of performance are clearly stated in the alleged contract; however, it is clear that the amount to be paid is indefinite. The alleged employment agreement merely provides for a salary for the first ninety-days with a review to be performed thereafter. As a result, such an agreement is unenforceable as a binding contract. *See Pita v. Whitney,* 190 Ga. 810, 814, 10 S.E.2d 851 (1940) (finding no binding employment contract where fixed monthly salary established for first year with revised salary to be determined thereafter). Summary judgment will, therefore, be granted to Defendants on Bertotti's breach of contract claim.

## IV. *Defamation Claim*

In count three of her complaint, Bertotti includes a defamation claim against Fry. Bertotti contends that in responding to the EEOC's investigation of Bertotti's discrimination charge, Fry submitted an affidavit that "contained numerous false statements and allegations materially slandering and libeling Plaintiff Tracy Bertotti." (Compl. at ¶ 32). She contends that a number of Fry's statements regarding Bertotti's qualifications

and job performance were false; however, Bertotti takes particular issue with the following statements by Fry:

> Tracy would bring her personnel [sic] problems to work and Tracy would sleep with other men in the hotel. Tracy [sic] husband/boyfriend came to the hotel to confront her about the individuals she slept with. Tracy asked Norman Wiley to pull down his pants and "lets [sic] do it now." Tracy did not conduct herself in a professional manner and her character is questionable.

In addition to the challenge to Fry's statements in the affidavit to the EEOC, Bertotti contends that she was slandered in references made by Defendants to subsequent prospective employers. Specifically, she claims that "everything was go" regarding a job with the Sea Island Company until her references were checked. (Bertotti Dep. at 126). In addition, she claims that persons at the Jekyll Inn informed her that her references seemed to indicate that she had gone through drug and alcohol dependency treatment. *Id.* at 129. In neither of these instances were Defendants specifically identified as providing whatever information resulted in the adverse employment decision.

■ With regard to Fry's statements made to the EEOC, Defendants contend, and Bertotti concedes, that such statements were made in the course of a quasi-judicial proceeding, thereby raising a conditional privilege to the statements. *See Lamb v. Fedderwitz,* 68 Ga.App. 233, 235, 22 S.E.2d 657 (1942), *aff'd,* 195 Ga. 691, 25 S.E.2d 414 (1943). In addition, Defendants argue, and this Court concurs, that responses by past employers to inquiries from prospective employers, similarly, raises a conditional privilege based on the performance of a private duty. *See* O.C.G.A. § 51–5–7(2) (1982) ("Statements made in good faith in the performance of a ... moral private duty" are privileged); *see also Kenney v. Gilmore,* 195 Ga.App. 407, 409, 393 S.E.2d 472 (1990) ("Georgia courts have long recognized that a prima facie privilege shields statements made concerning a current or former employee by a current or former employer to one, such as a prospective employer, who has

a legitimate interest in such information."). The effect of the conditional privilege is that the presumption of malice, which is given in a *per se* defamation action and is a necessary element of such a claim, is removed and, thus, the plaintiff must prove actual malice. *See Sparks v. Parks,* 172 Ga.App. 823, 826–27, 324 S.E.2d 784 (1984).

In the present action, Fry has stated that any statements that she made to the EEOC or to any prospective employers were made in good faith and without malice. (Fry Aff. at ¶¶ 5 & 10). In response, Bertotti has presented no more evidence of malice than her own conclusory allegations in her affidavit. (Bertotti Aff. at ¶¶ 4, 5 & 7). As Defendants note, mere conclusory allegations of malice, when rebutted by a defendant's direct testimony of good faith and lack of malice, is insufficient to withstand a motion for summary judgment. *See, e.g., Sparks,* 172 Ga. App. at 826, 324 S.E.2d 784 (where defendant "disclaimed any malice" he carried his burden and plaintiff's conclusory allegations of malice were insufficient to demonstrate genuine issue for trial). Because Bertotti has failed to meet her burden to demonstrate malice, summary judgment will be granted to Defendants on this claim.

## CONCLUSION

For the foregoing reasons, summary judgment is hereby GRANTED in favor of Defendants. The Clerk of Court is directed to enter an appropriate judgment for Defendants.

**SO ORDERED.**