MARILYN JANCEY & others[1] *vs.* SCHOOL COMMITTEE OF
EVERETT.

Middlesex. September 13, 1995. - December 12, 1995.

Present: LIACOS, C.J., WILKINS, LYNCH, & O'CONNOR, JJ.

*Massachusetts Equal Pay Act. Federal Equal Pay Act. Statute,* Con-
struction. *School and School Committee,* Compensation of personnel,
Cafeteria worker, Custodian. *Anti-Discrimination Law,* Sex. *Massa-
chusetts Tort Claims Act. Words,* "Comparable," "Like," "Equal
work," "Wages."

Discussion of the purpose and legislative history of the Massachusetts
equal pay act, G. L. c. 149, § 105A, and the meaning of the term
"comparable" found therein. [486-487, 488-489]

Discussion of the differences in analysis of the term "comparable" under
the Massachusetts equal pay act, G. L. c. 149, § 105A, and the Federal
equal pay act, 29 U.S.C. § 206 (d) (1). [487-488, 489]

This court concluded that a two-part analysis is required under the Massa-
chusetts equal pay act, G. L. c. 149, § 105A, for purposes of making a
determination whether the work of two jobs is "comparable" such that
equal pay is required: first, whether the substantive content, that is, the
duties of the jobs have "important common characteristics" and, then,
whether the two positions entail comparable skill, effort, responsibility
and working conditions; an action asserting claims under the act was
remanded for the application of this analysis to the facts of the case.
[489-490]

Discussion of cases and statutes construing the term "wages." [490-492]

This court concluded that the terms "wages" and "wage rates" used in the
Massachusetts equal pay act, G. L. c. 149, § 105A, should be construed
broadly to include fringe benefits or other remunerations paid to the
workers in question, and on remand of an action asserting claims under
that statute, the judge was to consider evidence of such benefits and
remunerations. [493]

This court concluded that, to establish a violation of the Massachusetts
equal pay act, G. L. c. 149, § 105A, a plaintiff need not prove that the

---

[1]Ida Corriere and others similarly situated. A motion for class certifi-
cation was allowed in the Superior Court.

employer in question intended to discriminate against the plaintiff on the basis of sex. [493-495]

General Laws c. 151B was not the exclusive remedy for plaintiffs' claims based on unequal pay where the antirepeal language of § 9 of that statute was applicable to allow claims under G. L. c. 149, § 105A, the Massachusetts equal pay act, in a case where no procedure under G. L. c. 151B, § 5, was "pending" as to any acts declared unlawful under G. L. c. 151B, § 4. [495-499]

The definitions of employer and employee appearing in G. L. c. 149, § 1, encompass employers and employees in the public sector as well as the private sector. [499-500]

The Massachusetts tort claims act, G. L. c. 258, was not applicable to nontort claims of wage discrimination in violation of G. L. c. 149, § 150A, brought against a public employer. [500-501]

CIVIL ACTION commenced in the Superior Court Department on June 9, 1989.

The case was heard by *Gordon L. Doerfer*, J.

The Supreme Judicial Court granted an application for direct appellate review.

*Juliane Balliro* (*Frank Mondano* with her) for the defendant.

*Ann M. Gilmore* (*Lee D. Goldstein* with her) for the plaintiffs.

*Harold L. Lichten & Robert S. Mantell*, for National Employment Lawyers Association, Massachusetts Chapter, amicus curiae, submitted a brief.

LYNCH, J. The plaintiffs, female cafeteria workers in the Everett public schools, filed a complaint against their employer, the school committee of Everett (school committee), alleging violations of the Massachusetts antidiscrimination law, G. L. c. 151B (1994 ed.), the Massachusetts equal pay act, G. L. c. 149, § 105A (1994 ed.) (MEPA), the Federal equal pay act, 29 U.S.C. § 206 (d) (1) (1988) (FEPA), and State and Federal constitutional provisions.[2] The plaintiffs

---

[2]The plaintiffs set forth in their complaint that they had filed a complaint with the Massachusetts Commission Against Discrimination (MCAD), alleging that they had received disparate compensation for their work as compared to men who held comparable positions. They assert that

amended their complaint in December, 1989, to add a claim under the Massachusetts equal rights act, G. L. c. 93, §§ 102-103 (1994 ed.).

The case proceeded to trial solely on the MEPA claim.[3] The trial was bifurcated and on the liability phase the judge ruled that the school committee had violated MEPA by paying the female cafeteria workers a lower wage than the male custodians. In reaching this conclusion he found that "the work of cafeteria workers and custodians required substantially comparable skills, efforts, responsibilities, and working conditions." It followed, then, the judge decided, that "[t]he work of the women employed . . . as cafeteria workers is therefore of comparable character to the work of the men employed as Everett School custodians."

On the remedy phase of the case the judge awarded the plaintiffs a total of $1,041,062.11.[4] We granted the school committee's application for direct appellate review and now vacate and remand for additional proceedings.[5]

We summarize the most pertinent findings as follows:[6]

1. On average, Everett public school custodians were paid roughly twice what cafeteria workers were paid.

2. All the cafeteria workers have always been women and all the custodians have always been men.

they commenced the Superior Court action after receiving written consent of the MCAD. The school committee does not dispute this claim. However, the record appendix does not reflect any action before the MCAD.

[3]Prior to trial, the judge struck the plaintiffs' claim for a jury trial. The propriety of this ruling is not raised in this appeal. Contra *Dalis* v. *Buyer Advertising, Inc.*, 418 Mass. 220, 226 (1994) (plaintiff in MEPA action entitled to jury trial).

[4]The judgment consisted of: $325,788 in unpaid wages; $325,788 in liquidated damages; $219,581.11 in prejudgment interest on unpaid wages; $165,000 in attorney's fees; and $4,905 in costs.

[5]We acknowledge the amicus brief of the Massachusetts Chapter of the National Employment Lawyers Association.

[6]For a more detailed discussion see 59 Fair Empl. Prac. Cas. (BNA) 1314 (1992).

3. No prior experience, training, or education was required for the positions of Everett school custodians or cafeteria workers.

4. Both cafeteria workers and custodians:

> (a) are occasionally exposed to extremes of heat and cold;

> (b) are occasionally exposed to various cleaning agents necessary to perform their cleaning and sanitizing functions;

> (c) are exposed to and occasionally suffer from lifting injuries, cuts, slips, and falls.

5. The skill required to perform the duties of Everett school cafeteria workers is comparable to the skill required to perform the duties of Everett school custodians.

6. The over-all effort of the cafeteria workers, including physical and mental exertion, is comparable to the over-all effort of the custodians.

7. The responsibility or importance of the duties of the cafeteria workers is comparable to the responsibility or importance of the duties of the custodians.

8. The working conditions of the cafeteria workers are comparable to the working conditions of the custodians.

We begin our analysis with the language of G. L. c. 149, § 105A, which provides, in relevant part:

> "No employer shall discriminate in any way in the payment of wages as between the sexes, or pay any person in his employ salary or wage rates less than the rates paid to employees of the opposite sex for work of like or comparable character or work on like or comparable operations; provided, however, that variations in rates of pay shall not be prohibited when based upon a difference in seniority."

The judge found that the school committee paid the female cafeteria workers salary or wage rates less than the rates paid to the male custodians for work of like or comparable character.

The school committee raises a number of challenges to the judge's rulings on both liability and remedy. We address them below:

1. *Comparable work standard.* Because we conclude that the judge applied the wrong standard in deciding that the work of the two groups was of comparable character, we turn to that issue first. The word "comparable" is not defined in the statute; we look, therefore, at both its literal meaning and at the purpose and legislative history of the statute. See *Massachusetts Hosp. Ass'n* v. *Department of Medical Sec.*, 412 Mass. 340, 346 (1992).

Massachusetts was the first State to adopt legislation requiring equal pay for comparable work. St. 1945, c. 584, § 3, approved July 10, 1945. In its original form the statute required equal pay for "work of comparable character or work on comparable operations." No exceptions were enumerated. The statute was enacted against the backdrop of regulations of the National War Labor Board in force during World War II. See *County of Washington* v. *Gunther*, 452 U.S. 161, 185 n.1 (1981) (Rehnquist, J., dissenting).

In 1947, the Legislature rewrote the statute and used the phrase "work of *substantially the same character* or work on *substantially the same operations*" (emphasis supplied). St. 1947, c. 565. The revision also provided numerous exceptions permitting disparities in wages between the sexes based on "difference in seniority, experience, training, skill or ability, or difference in duties or services performed whether regularly or occasionally or difference in availability for other operations, or any other reasonable differentiation except difference in sex." *Id.*

In 1951, the Legislature again rewrote the statute by reinstating the term "comparable" and adding the term "like" to provide equal pay for "work of like or comparable character or work on like or comparable operations." St. 1951, c. 180.

In addition, the Legislature eliminated all but one of the exceptions, retaining only the exception for a wage differential based on seniority. *Id.*

The judge concluded that "work of like or comparable character" is a broader concept and a more inclusive term than "equal work." He based this conclusion on the legislative history of MEPA, the legislative history of FEPA[7] and on interpretations of the Oregon comparable work law, Or. Rev. Stat. § 652.220 (1987).[8]

The judge ruled that the test for determining whether the work of the cafeteria workers and the custodians was "of like or comparable character" was whether the work required comparable skill, effort, responsibility, and working conditions. These are the factors used in FEPA and other similar statutes. See 29 U.S.C. § 206 (d) (1) ("equal work on jobs, the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions"), and Me. Rev. Stat. Ann. tit. 26, § 628 (1988) ("comparable work on jobs which have comparable requirements relating to skill, effort and responsibility"). The judge then determined that, since the skill, effort, responsibility, and working conditions of the two positions were comparable, the over-all character of the work was comparable within the meaning of the statute.

We conclude that the judge's analysis was improper. While skill, effort, responsibility, and working conditions are relevant factors in determining whether two positions are comparable, the inquiry does not end there. The Federal law differs significantly from our statute by requiring that the rate of pay be for equal work. It is within the framework

---

[7]See *County of Washington* v. *Gunther*, 452 U.S. 161, 184-188 (1981) (Rehnquist, J., dissenting).

[8]Or. Rev. Stat. § 652.220 (1)(b) provides, in relevant part: "No employer shall . . . [p]ay wage rates to any employee at a rate less than that at which the employer pays wages to employees of the opposite sex for work of comparable character, the performance of which requires comparable skills." See *Smith* v. *Bull Run Sch. Dist. No. 45*, 80 Or. App. 226, 229 (1986); *Bureau of Labor & Indus.* v. *Roseburg*, 75 Or. App. 306, 309 n.2 (1985).

established by Federal law that FEPA requires that jobs be evaluated in terms of skill, effort, responsibility, and working conditions. In contrast MEPA does not specify a particular set of factors to be used in determining whether work is comparable rather than equal. Furthermore, the Federal statute contains several affirmative defenses or exceptions that take pay differentials outside of its ambit. In view of these differences, we do not follow slavishly the Federal approach, but rather we examine the meaning of the word "comparable" in light of our own history and experience.

The legislative history of MEPA indicates that, in 1951, the Legislature struck the 1947 version of the statute and substituted the language "like or comparable" for the words "substantially the same." In view of this legislative history and interpretations of the analogous Oregon statute we accept the judge's reasoning that "comparable" is a more inclusive term than "equal." As the Oregon Court of Appeals noted, "[w]ork of 'comparable character' is broader than 'equal work.' 'Comparable' does not require equality but that two items have important common characteristics." *Bureau of Labor & Indus.* v. *Roseburg,* 75 Or. App. 306, 309 n.2 (1985).

The historical context into which MEPA was enacted is also relevant. The original statute, which contained the word "comparable," was added in 1945 at a time when the National War Labor Board required equal pay for comparable work. As two recent commentators noted:

> "For the most part . . . the sex-related wage claims considered by the War Labor Board involved an 'equal pay for equal work' doctrine, that is, equal payment for the same tasks on jobs presently or formerly performed by males. When comparisons of dissimilar jobs were requested, the Board generally presumed that the existing wage rates were correct and referred the cases to the disputing parties for negotiation, with the suggestion or order that a job evaluation system be instituted to consider the worth of the job on the basis of content, irre-

spective of the sex of any incumbent. Generally, however, the Board did not attempt to establish the relative worth of dissimilar jobs and, as the *General Electric and Westinghouse* decision [28 War Lab. Rep. 666 (1945)] indicates, it found the comparison task beyond its capabilities."

R.E. Williams & D.S. McDowell, The Legal Framework, Comparable Worth: Issues and Alternatives 197, 211 (E.R. Livernash, ed. 1980). Thus, the historical context provides little support for applying the term "comparable" to positions with dissimilar substantive content. See generally *General Elec. Co. & Westinghouse Elec. Co., supra.*

Ignoring the content of the specific jobs and focusing only on skill, effort, responsibility, and working conditions of the positions only makes sense where the standard is "equal pay for equal work" as in FEPA. Under that standard, the term "equal work" supplies the requirement of similar job content. Under the more inclusive "comparable work" standard, on the other hand, jobs meeting the factors of the Federal statute could still differ significantly in job content. It is difficult to see how jobs could have "comparable character" within the meaning of the statute, if their substantive job content was not also comparable.

Furthermore a standard which required equal pay for jobs which differ significantly in their substantive content would likely impose on employers an unfair burden and produce inconsistent and confusing results.

We conclude, therefore, that in applying the broader "comparable" standard, the statute requires a two-part analysis. First, the judge must determine whether the substantive content of the jobs is comparable, that is, whether the duties of the jobs have "important common characteristics." *Bureau of Labor & Indus.* v. *Roseburg, supra.* To ignore job content when applying the "comparable" standard is to attempt the impossible task of comparing disparate concepts. In other words two positions that are so dissimilar in their

substantive content that a reasonable person would regard them as categorically separate are not "comparable."

It is only when a determination is made that the jobs are comparable in substantive content, that the second inquiry is appropriate — whether the two positions entail comparable skill, effort, responsibility, and working conditions. If the answer to both inquiries is "Yes," then employees in the two positions must receive equal pay.

2. *Wages*. In determining that the cafeteria workers were paid a lower wage, the judge did not consider evidence regarding fringe benefits, including health insurance and other types of remuneration. Instead, his findings regarding the wage issue focus exclusively on the base hourly pay received by the employees. The school committee argues that the judge's failure to consider other forms of remuneration, including insurance and other benefits and not just the base hourly pay, was error. We agree.

The terms "wages" and "wage rate" are not defined in the statute. Neither are they defined in any interpretive regulation or other administrative materials. Therefore we look to other sources for determining how to construe the term in the context of a remedial statute such as MEPA. See *Commissioner of Revenue* v. *AMIWoodbroke, Inc.*, 418 Mass. 92, 96-97 (1994); *Concord Rod & Gun Club, Inc.* v. *Massachusetts Comm'n Against Discrimination*, 402 Mass. 716, 721 (1988).

"As the statute does not effectively define [the terms 'wages' and 'wage rate'], we have said that the Legislature should be supposed to have adopted the common meaning of the word, as assisted by a consideration of the historical origins of the enactment." *Westinghouse Broadcasting Co.* v. *Commissioner of Revenue*, 382 Mass. 354, 357 (1981), quoting *First Data Corp.* v. *State Tax Comm'n*, 371 Mass. 444, 447 (1976). Black's Law Dictionary 1579 (6th ed. 1990) defines "wages:"

"Every form of remuneration payable for a given period to an individual for personal services, including salaries,

commissions, vacation pay, dismissal wages, bonuses and reasonable value of board, rent, housing, lodging, payments in kind, tips, and any other similar advantage received from the individual's employer or directly with respect to work for him. . . . Term should be broadly defined and includes not only periodic monetary earnings but all compensation for services rendered without regard to manner in which such compensation is computed. . . ." (Citations omitted.)

General Laws c. 151A, § 1 (*s*) (A) (1994 ed.), adopts similar language for its definition of wages in the employment security context:

"[E]very form of remuneration of an employee subject to this chapter for employment by an employer, whether paid directly or indirectly, including salaries, commissions and bonuses, and reasonable cash value of board, rent, housing, lodging, payment in kind and all remuneration paid in any medium other than cash [with exceptions]."

We also look to the analogous Federal statute for guidance. See *Tate* v. *Department of Mental Health*, 419 Mass. 356, 361 (1995). FEPA states in relevant part: "No employer . . . shall discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work . . . ." Compare MEPA ("[n]o employer shall . . . pay any person . . . salary or wage rates less than the rates paid to employees of the opposite sex . . .").[9]

---

[9]See also Or. Rev. Stat. § 652.210 (3) (1988) (for purposes of comparable work statute wages defined as "all compensation for performance of service by an employee for an employer whether paid by the employer or another person, including cash value of all compensation paid in any medium other than cash").

Regulations promulgated pursuant to FEPA also reflect the Black's Law Dictionary definition of "wages:"

"Under [FEPA], the term 'wages' generally includes all payments made to [or on behalf of] an employee as remuneration for employment. The term includes all forms of compensation irrespective of the time of payment, whether paid periodically or deferred until a later date, and whether called wages, salary, profit sharing, expense account, monthly minimum, bonus, uniform cleaning allowance, hotel accommodations, use of company car, gasoline allowance, or some other name. *Fringe benefits are deemed to be remuneration for employment*" (emphasis added).

29 C.F.R § 1620.10 (1995).[10]

The United States District Court for the Southern District of Georgia recently construed these definitions in *Bertotti* v. *Philbeck, Inc.*, 827 F. Supp. 1005 (S.D. Ga. 1993). The plaintiff in *Bertotti* was a female hotel restaurant worker whose monthly salary was less than those of two male coworkers. The defendant employer argued that the plaintiff did not receive a lower wage than the male workers because she received health insurance benefits and they did not. When added together, the value of her salary and health insurance benefits exceeded the total remuneration her uninsured male coworkers received. The court, looking at the definition of "wages" contained in 29 C.F.R. § 1620.10, determined that the plaintiff was paid a higher wage than her male coworkers. *Id.* at 1010. The court held that the plaintiff did not have a valid claim under FEPA and granted summary judgment for the employer. *Id.*[11]

---

[10]In addition, 29 C.F.R. § 1620.12 (a) (1995) provides, in relevant part: "The term wage 'rate,'. . . *refers to the standard or measure by which an employee's wage is determined* and is considered to encompass all rates of wages whether calculated on a time, commission, piece, job incentive, profit sharing, bonus, or other basis."

[11]Even before the above-cited regulation was promulgated in 1986, Federal courts had interpreted the term "wages" to include fringe benefits pro-

*Bertotti* highlights one of the sound policy reasons for construing the terms "wages" and "wage rate" broadly. Such a construction protects both employers and employees. If we construe the term narrowly to exclude insurance and other benefits, some employees, such as the plaintiff in *Bertotti*, would have valid claims even though they were receiving total compensation equal to or greater than that of their co-workers of the opposite sex. Such a result would punish employers for deciding to allocate resources depending on their needs and the needs of their employees. Alternatively, a narrow construction could also allow some employers to evade the purposes of the legislation by paying male and female employees in comparable jobs the same hourly rate, but discriminating against employees on the basis of sex in providing insurance and other benefits. Such an interpretation makes no sense where the commonly understood meaning of the term "wages" would avoid such an inequitable result.

Furthermore, interpreting equal pay statutes to exclude fringe benefits ignores the realities of the economic marketplace. American employees receive on average between seventeen and twenty-nine per cent of their total compensation in the form of insurance and other benefits. United States Department of Commerce, Statistical Abstract of the United States 1994 at 427, 433 (114th ed. 1994).

The judge excluded evidence regarding the amount of fringe benefits or other remunerations paid to the workers. This was error. Accordingly, in any further proceedings, all elements of remuneration should be considered.

3. *Discriminatory intent.* The judge ruled that "[t]he clear language of the statute makes it unnecessary to consider questions of discriminatory intent." In so ruling the judge drew on cases interpreting FEPA and the Oregon comparable work law. See *Corning Glass Works* v. *Brennan*, 417 U.S. 188, 195 (1974). See also *Smith* v. *Bull Run Sch. Dist.*

---

vided primarily for the benefit of the employees. See *Laffey* v. *Northwest Airlines, Inc.*, 642 F.2d 578, 587-589 (D.C. Cir. 1980). See also *Donovan* v. *K F C Servs., Inc.*, 547 F. Supp. 503, 508 (E.D.N.Y. 1982).

*No. 45*, 80 Or. App. 226, 229 (1986) (interpreting Oregon comparable work statute).

The school committee argues that MEPA should be construed to require proof that it was motivated by an intent to discriminate against the plaintiffs. According to the school committee, the lack of an intent element in FEPA is equitable because it contains several affirmative defenses, including a broad catch-all defense permitting pay discrepancies based on "any other factor other than sex." 29 U.S.C. § 206 (d) (1).[12] According to the school committee, these affirmative defenses ensure that no employer will be held liable for damages in the absence of purposeful discrimination. Because MEPA only provides employers with one affirmative defense for pay inequalities based on seniority, the school committee assumes that the Legislature intended to restrict the statute to purposeful acts.

We conclude otherwise. The plain language of the statute does not require a finding of purposeful discrimination. An employer violates the statute if members of one sex receive wages at a lower rate than members of the opposite sex for work of like or comparable character. There is no requirement that the employer "discriminate" against one sex or the other, or that the decision to pay one sex less be based on considerations of gender. Instead, the statute on its face creates a form of strict liability.

The school committee urges us to infer an intent element based on the dearth of affirmative defenses. We decline to do so in light of the legislative history of MEPA. As discussed *infra*, the statute as originally enacted in 1945 contained no defenses. In 1947, the Legislature added several defenses, including "any other reasonable differentiation except difference in sex." St. 1947, c. 565. At this point, presumably, the statute was roughly equivalent to the Federal law as it is now written, and did not require a plaintiff to prove intent. Three

---

[12]See also Or. Rev. Stat. § 652.220 (2)(b) (1988) (no violation of comparable work law where wage differential "is based in good faith on factors other than sex").

years later, the Legislature again rewrote the statute, this time removing all but one of the defenses it had added in 1947. St. 1951, c. 180. The sole remaining defense was for pay inequities based on seniority. The 1951 version did not include any language indicating that the removal of the defenses had any effect on a plaintiff's burden. Had the Legislature intended to affect a plaintiff's burden of proof, it had ample opportunity to state so explicitly. It did not. Accordingly, we decline to read the statute to require that the plaintiffs prove that the employer intended to discriminate against them on the basis of sex.[13]

4. *Exclusivity.* The school committee argues that the plaintiffs' MEPA claim is barred by the exclusivity provisions of G. L. c. 151B. We disagree.

General Laws c. 151B, § 9, provides, in relevant part:

> "The provisions of this chapter shall be construed liberally for the accomplishment of the purposes thereof, and any law inconsistent with any provision hereof shall not apply, but nothing contained in this chapter shall be deemed to repeal any provision of chapter one hundred and forty-nine which establishes standards, terms or conditions of employment which are applicable to females . . . but, as to acts declared unlawful by section four, the procedure provided in this chapter shall, while pending, be exclusive; and the final determination therein shall exclude any other action, civil or criminal, based on the same grievance of the individual concerned."

The school committee argues that, in order to comply with the above language, the plaintiffs must bring their unequal

---

[13]The school committee also argues that MEPA's liquidated damages provision indicates that proof of intent is required. It is true that the plain language of the statute provides for double damages when an employer is found liable. Contrary to the school committee's assertions, however, we have applied the plain language of statutory provisions providing for multiple damages in the absence of bad faith or wilful, intentional, or egregious conduct. See *Mellor* v. *Berman*, 390 Mass. 275, 282-283 & n.11 (1983).

pay claims under c. 151B exclusively. "As a starting point for our analysis we assume, as we must, that the Legislature was aware of the existing statutes in enacting [c. 151B], *Mathewson* v. *Contributory Retirement Appeal Bd.*, 335 Mass. 610, 614 (1957), and that if possible a statute is to be interpreted in harmony with prior enactments to give rise to a consistent body of law. *Everett* v. *Revere*, 344 Mass. 585, 589 (1962)." *Charland* v. *Muzi Motors, Inc.*, 417 Mass. 580, 582-583 (1994), quoting *Hadley* v. *Amherst*, 372 Mass. 46, 51 (1977).

Here, it is abundantly clear that the Legislature was aware of MEPA's provisions when it enacted and amended G. L. c. 151B's antidiscrimination provisions. MEPA was enacted originally by St. 1945, c. 584, § 3. Thus, MEPA was an existing statute when the Legislature enacted the original provisions of c. 151B. See St. 1946, c. 368, § 4. More significantly, when c. 151B was amended to include gender as a protected category, see St. 1965, c. 397, §§ 4-6 (adding the word "sex" to G. L. c. 151B, § 4 [1], [2], [3]), the Legislature simultaneously amended § 9 to include the antirepeal language quoted above. St. 1965, c. 397, § 7. Moreover, at the time of the 1965 amendments to c. 151B, the relevant portion of MEPA provided: "[n]o employer shall . . . pay any female in his employ salary or wage rates less than the rates paid to male employees . . . ." No other provision of c. 149 then referred to disparate treatment based on sex. Thus, it is clear that MEPA was one, if not the primary, referent of the antirepeal language in G. L. c. 151B, § 9.

The school committee argues that the phrase "applicable to females" does not apply to MEPA as amended because the statute was made sex neutral as a result of a 1980 amendment. St. 1980, c. 131, § 6. Such a formalistic interpretation goes against both the rules of statutory construction and common sense. Furthermore, although MEPA is now sex neutral, it is still "applicable to females" for purposes of G. L. c. 151B, § 9. By referring to the paying of lower salaries to "employees of the opposite sex," the statute applies equally to both females and males. We see no reason to ac-

cept the school committee's argument that we should read "applicable to females" as applicable to females *exclusively.* Amending the statute to include situations in which men are paid at a lower rate than women does not change the focus of the statute so much as expand its coverage. The purpose of the statute continues to be the same: to remedy pay inequities between male and female employees in comparable positions.

While the antirepeal language in § 9 does not preclude the plaintiffs from suing under MEPA, we agree with the school committee that c. 151B does provide an exclusive route for some sex-based pay inequity claims. The school committee argues convincingly that the word "but" following the semicolon in the first sentence of § 9 modifies the entire preceding portion of the sentence, including the antirepeal language. We agree that it does. See *Moulton* v. *Brookline Rent Control Bd.,* 385 Mass. 228, 230-231 (1982). Applying the plain language of the second clause of § 9, then, if the complained-of acts of the employer in this case are among those "declared unlawful by section four" and the procedure provided in c. 151B is "pending," then c. 151B provides the exclusive remedy.

The plaintiffs argue that their case meets neither prerequisite for exclusivity under § 9. We agree that c. 151B does not provide the exclusive remedy where, as here, the case is no longer "pending" and so we do not decide whether the acts complained of by the plaintiffs are unlawful under G. L. c. 151B, § 4.

We recently had an opportunity to construe the "while pending" language in G. L. c. 151B, § 9, in a related context. In *Charland* v. *Muzi Motors, Inc., supra,* we concluded that a plaintiff's claim of age or national origin discrimination against his employer under the Massachusetts equal rights act, G. L. c. 93, §§ 102, 103, was barred where the plaintiff failed to pursue his antidiscrimination claim by filing a complaint with the MCAD within six months of the discriminatory act or acts. *Charland, supra* at 586. See G. L. c. 151B, § 5. We acknowledged that "[c.] 151B provides 'two largely

independent avenues for redress of violations of the antidiscrimination laws of the Commonwealth, one through the MCAD . . . and the other in the courts.'" *Charland, supra* at 583, quoting *Christo* v. *Edward G. Boyle Ins. Agency, Inc.*, 402 Mass. 815, 817 (1988). We went on to state:

> "In essence the words 'while pending' are an acknowledgment that a complaining employee must first file his claim with the MCAD, and that the pending claim may be decided administratively with judicial review of the final administrative decision. If the employee opts for judicial determination of his claim, he may do so only ninety days after filing the claim (or sooner with permission) in which case the administrative process terminates, and *the claim is no longer pending before the MCAD*" (emphasis supplied).

*Id.* at 585.

Thus, the phrase "while pending" refers to the administrative procedure provided for in G. L. c. 151B, § 5. Once the complainant chooses a judicial determination instead of an administrative one, the case is not "pending" within the meaning of G. L. c. 151B, § 9. To construe the language "while pending" to encompass all claims capable of decision by the MCAD, regardless of whether the MCAD actually has the opportunity to decide them, would frustrate the statute's purpose of providing complainants with two separate routes for determination of their discrimination claims.[14]

---

[14]There is no question that the core holding of *Charland* v. *Muzi Motors, Inc.*, 417 Mass. 580, 582-583 (1994), does not apply here. There, we concluded that complainants whose claims are cognizable under c. 151B may not bypass that statute's administrative procedures merely by claiming a violation of the Massachusetts equal rights act, G. L. c. 93, §§ 102-103. Here, by contrast, the plaintiffs complied with the procedural requirements of G. L. c. 151B, § 9. They timely filed a discrimination complaint with MCAD and, after the statutory period, sought and received permission from MCAD to withdraw their complaint and sue in court. See note 2, *supra*. See also *Agin* v. *Federal White Cement, Inc.*, 417 Mass. 669, 672 (1994).

In light of the above analysis, even if the acts described by the judge's findings are among those "declared unlawful" by c. 151B, § 4, the plaintiffs' MEPA claim is not barred by the exclusivity provisions of G. L. c. 151B.

5. *Immunity from suit.* The school committee argues that the "employer"[15] in this case is immune from suit under MEPA because (1) municipalities are not "employers" within the meaning of MEPA, and (2) the Massachusetts Tort Claims Act, G. L. c. 258 (1994 ed.), provides the exclusive remedy for recovery against a municipality. We disagree.

Municipal employees can clearly sue their employer under the provisions of MEPA. At the time the original MEPA was enacted, the Legislature added the following definitions to G. L. c. 149:

> " 'Employee', as used in sections one hundred and five A to one hundred and five C, inclusive, shall mean any person employed for hire by an employer *in any lawful employment,* but shall not include: [domestic workers, agricultural workers, or employees of religious and charitable institutions]."

> " 'Employer', as used in said sections one hundred and five A to one hundred and five C, inclusive, shall include any person acting in the interest of an employer directly or indirectly.

> " 'Employment', as used in sections one hundred and five A to one hundred and five C, inclusive, means any employment under contract of hire, expressed or im-

---

[15]We agree with the judge that, for purposes of their MEPA claim, the school committee is the plaintiffs' employer. Compare *School Comm. of Brockton* v. *Massachusetts Comm'n Against Discrimination,* 377 Mass. 392, 394 (1979) (school committee is employer for purposes of discrimination claim under G. L. c. 151B) with G. L. c. 258, § 1 (1994 ed.) ("[w]ith respect to public employees of a school committee of a city or town, the public employer for the purposes of this chapter shall be deemed to be said respective city or town").

plied, written or oral, including all contracts entered into by helpers and assistants of employees, whether paid by employer or employee, if employed with the knowledge, actual or constructive, of the employer in which all or the greater part of the work is to be performed within the commonwealth." (Emphasis added.)

G. L. c. 149, § 1, as amended through St. 1945, c. 584, §§ 1, 2.

These definitions are quite broad and appear on their face to encompass employers and employees in both the public and private sectors. We will not read into them an implied exclusion of public employment. If the Legislature had intended to exclude public employment from coverage, it could have done so by express language. See, e.g., G. L. c. 149, § 178A (1994 ed.). See also *Hepner's Case*, 29 Mass. App. Ct. 208, 211-212 (1990).

6. *Tort claims act.* The school committee's argument that G. L. c. 258 provides the exclusive remedy also fails. There are several problems with this argument. First, the nonjurisdictional aspects of the argument are waived, since they were not raised below. See *Budish* v. *Daniel*, 417 Mass. 574, 577 n.5 (1994). Cf. *Litton Business Sys., Inc.* v. *Commissioner of Revenue*, 383 Mass. 619, 622 (1981). Second, even if the issue is jurisdictional, the school committee's argument fails on the merits.

Chapter 258 provides a remedy for any "injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment." G. L. c. 258, § 2. It also provides that "[t]he remedies provided by this chapter shall be exclusive . . . ." *Id.*

The school committee argues that, since the plaintiffs have not alleged any intent on the part of the school committee, then the complained-of acts constitute torts, and therefore the plaintiffs must make a claim against the city of Everett under G. L. c. 258. Since they have made no such claim the plaintiffs' claim must fail, the school committee contends.

We find two flaws in the school committee's argument. First, even though wage discrimination "has historical connections to common law tort and contract claims," *Dalis* v. *Buyer Advertising, Inc.*, 418 Mass. 220, 226 (1994), acts of discrimination — whether intentional or unintentional — do not thereby become torts. See *Whitney* v. *Worcester*, 373 Mass. 208, 216 n.10 (1977) ("The inquiry into governmental tort liability in a particular case must begin with a determination whether the conduct in question was in fact tortious"). Under the school committee's interpretation of G. L. c. 258, plaintiffs with claims for unintentional discrimination against a public employer based on a disparate impact theory under c. 151B, for example, would be required to pursue those claims exclusively under c. 258. Cf. *School Comm. of Braintree* v. *Massachusetts Comm'n Against Discrimination*, 377 Mass. 424, 429 (1979). Second, unlike a claim under c. 258, the plaintiffs do not allege that their employer is indirectly liable to them for the injuries caused by its employees under the doctrine of respondeat superior. See *Doe* v. *Blandford*, 402 Mass. 831 (1988). Instead, the plaintiffs have alleged that the employer has violated MEPA directly by paying them lower wages than custodians. Since G. L. c. 258 only provides recovery for injuries caused by the acts or omissions of public employees, not public employers, it cannot apply in this case.

We vacate the judgment and remand the case to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*